TANNER ASSOCIATES, INC., A NEW JERSEY CORPORA-
TION, PLAINTIFF-APPELLANT, v. JOSEPH R. CIRALDO
AND ALFRED CIRALDO, DEFENDANTS-RESPONDENTS.

Argued May 10, 1960—Decided June 13, 1960.

*Mr. Eugene P. Kenny* argued the cause for the plaintiff-appellant.

*Mr. Eugene P. Sylvester* argued the cause for the defendants-respondents (*Messrs. Werksman, Saffron and Cohen,* attorneys; *Mr. Samuel Saffron,* of counsel; *Mr. Eugene P. Sylvester,* on the brief).

The opinion of the court was delivered by

BURLING, J.   This appeal involves the validity of a writ of attachment issued in connection with a suit initiated in the Superior Court, Law Division.   The writ, which had been issued at plaintiff's behest against property owned by the defendants, was vacated by the trial court upon defendants' motion.   This order was made on the ground that the affidavits filed on behalf of plaintiff, one to obtain an order of the trial court allowing the writ to issue, *R. R.* 4:77–1(*a*), and another on behalf of the plaintiff in opposition to defendants' motion to vacate, see *R. R.* 4:77–3 permitting submission of additional affidavits at any stage of the proceedings, failed to state a cause of action against defendants.   From this order the plaintiff prosecuted an appeal to the Superior Court, Appellate Division, but prior to argument in that court and while the cause was pending there, we certified it on our own motion.

## I.

### ADJECTIVE QUESTION.

█ The attachment statute, *N. J. S.* 2A:26–1 *et seq.,* is the sole source of an attachment remedy in this State. The procedure to be followed in pursuit of that remedy is determined by rule, *R. R.* 4:77, but we must ascertain from the statute whether there existed a right to the writ.   The statute provides:

"An attachment may issue out of the superior court, any county court or county district court upon the application of any resid nt or nonresident plaintiff against the property, real and personal, of any defendant in any of the following instances:

a. Where the facts would entitle plaintiff to an order of arrest before judgment in a civil action; and in such cases the attachment may issue against the property of a female, or of a corporation in the same manner as though the defendant would be liable to arrest in a civil action, except that, in actions founded upon a tort, an attachment shall not issue against a corporation upon which a summons can be served in this state; or

b. Where the defendant absconds or is a nonresident of this state, and a summons cannot be served on him in this state; but an attachment shall not issue hereunder against the rolling stock of a common carrier of another state or against the goods of a nonresident in transit in the custody of a common carrier of this or another state; or

c. Where the cause of action existed against a decedent, which survives against his heirs, devisees, executors, administrators or trustees, and there is property in this state which by law is subject to plaintiff's claim; but no action of attachment may be brought hereunder against the heirs unless they, or some of them, nor against the devisees unless they, or some of them, nor against the executors unless they, or some of them, nor against the administrators unless they, or some of them, nor against the trustees unless they, or some of them, are unknown or nonresident and cannot be served with a summons in this state; or

d. Where plaintiff has a claim of an equitable nature as to which a money judgment is demanded against the defendant, and the defendant absconds or is a nonresident and a summons cannot be served upon him in this state; or

e. Where the defendant is a corporation created by the laws of another state but authorized to do business in this state and such other state authorizes attachments against New Jersey corporations authorized to do business in that state.

For the purposes of this section a summons can be served upon a person in this state where service can duly be made upon someone on his behalf in the state, but not where service may be made only by publication in the state." *N. J. S. 2A:26–2*

Plaintiff in the instant case claimed the right to the writ under the terms of *subdivision b* quoted above. It appears from that portion of the statute that a writ may be issued at the instance of a plaintiff against the property of a nonresident defendant when the latter cannot be served with summons in this State. It is not expressly stated in *N. J. S. 2A:26–2, subd. b,* or elsewhere, see *R. R. 4:77,* that a plaintiff proceeding under *N. J. S. 2A:26–2, subd. b* must, in order to be entitled to the writ, state in his affidavit

a cause of action against the defendant, the nature and details of which must be specified.

The adjective problem presented by this situation is whether a plaintiff seeking attachment under *N. J. S. 2A*:26–2, *subd. b* must, in his affidavit filed to secure the writ, state a *prima facie* cause of action against the defendant in attachment. In other words, is the defendant in attachment entitled to prevail on a motion to discharge the writ issued under *N. J. S. 2A*:26–2, *subd. b* if the plaintiff's affidavits fail to state a cause of action against the defendant?

Attachment originated as one of the customs of the merchants of London which later came to use in the courts of that city and were adopted and modified by statute. *Goldmark v. Magnolia Metal Co.*, 65 *N. J. L.* 341 (*Sup. Ct.* 1900). It was used in certain instances as an original process, 1 *Tidd's Practice* 109 (*3d Amer. ed.* 1840) ; see *Watson v. Noblett*, 65 *N. J. L.* 506, 607 (*Sup. Ct.* 1900), but an early Practice Act adopted in this State, the act of February 14, 1799, *Paterson's Laws*, *p.* 355, eliminated this form of its use for a time. *Watson v. Noblett*, *supra*. As a remedy against debtors in instances where other creditors' remedies would be ineffective, however, the writ of attachment was early recognized and constantly employed in New Jersey. By an "Act of West Jersey" adopted in 1683 (quoted in *LeWine, Attachment in New Jersey* 761 (1936)), it was provided that three magistrates "upon just ground and suspicion of the parties [*i. e.*, debtors] absconding, and complaint of any of the creditors" were entitled to secure the absconder's goods and estates located in the Province for the benefit of the complaining creditor and other creditors who might apply. By the statute of December 16, 1748, "enacted by the Governor, Council and General Assembly" of the Colony of New Jersey, it was provided that a writ of attachment should issue on the applicant's oath that "the Defendant absconds himself from his creditors, that he is not (to the plaintiff's Knowledge or Belief) Residing in this Colony" at the time of the application for the writ,

and that the debt was more than what was cognizable before a Justice of the Peace.

The next important statute dealing with the subject of attachments was an act of March 8, 1798 (*Paterson's Laws, p.* 296), the first section of which provided:

"\* \* \* That if any creditor shall make oath or affirmation before any judge of any of the courts of record of this State, or justice of the peace of any county in the same, that he verily believes, that his debtor absconds from his creditors, and is not, to his knowledge or belief, resident in this State at that time, then it shall be the duty of the clerk of the supreme court, or of the court of common pleas, to issue a writ of attachment, \* \* \*"

The twenty-sixth section of this statute extended the remedy of attachment against the property of nonresident debtors. In this situation, the creditor's oath or affirmation was required to show:

"\* \* \* that the person, against whose estate such attachment is to be issued, is not, to his knowledge or belief, resident at that time in this State, and that he owes to the plaintiff a certain sum of money, specifying, as nearly as he can, the amount of the debt or balance, \* \* \*."

Under this statute, as under the preceding statutes, the writ issued only in the case of a liquidated claim against the debtor, *Moore v. Richardson & Baldwin,* 65 *N. J. L.* 531 (*Sup. Ct.* 1900); *Schenck v. Griffin,* 38 *N. J. L.* 462, 467 (*E. & A.* 1875); *Day v. Bennett,* 18 *N. J. L.* 287 (*Sup. Ct.* 1841), which was founded on contract; *Boyd v. King,* 36 *N. J. L.* 134 (*Sup. Ct.* 1873). It was not required, however, that the affidavit filed to secure the writ state any more than the jurisdictional prerequisites established by the statute; it was not necessary that the affidavit set forth the details of the cause of action. *Day v. Bennett,* 18 *N. J. L.* 287 (*Sup. Ct.* 1841). In *Shadduck v. Marsh,* 21 *N. J. L.* 434, 435 (*Sup. Ct.* 1848) it was said:

"\* \* \* The statute simply requires the applicant for the writ against a non-resident debtor, in addition to the fact of non-residence in this state, to swear that the defendant owes to the plaintiff a cer-

tain sum of money, or balance. *Rev. Stat.* 58 § 40. It is therefore *prima facie* sufficient in order to authorize the use of the writ if the plaintiff makes the affidavit in the terms required by the act."

By an act approved April 28, 1886, *P. L.* 1886, *p.* 314, the remedy was extended to cases where the liquidated amount was due on a penalty imposed by statute.

In 1893 the Legislature adopted a statute, *P. L.* 1893, *p.* 181, approved March 10, 1893, which provided as follows:

"* * * That in all cases in which a *capias ad respondendum* may issue against the defendant or defendants in any action upon contract, the court, or a judge thereof, or a supreme court commissioner, may, at the request of the plaintiff, upon filing the affidavits required as a foundation for an order for bail, by an order made for that purpose, award a writ or writs of attachment against the lands and tenements, goods and chattels, rights and credits, moneys and effects of the defendant or defendants, in this state, whether such defendant or defendants, or either of them, be a resident of this state or not, * * *"

The effect of this act was to extend the attachment remedy against fraudulent debtors, resident or nonresident. Its effect also was to require the creditor seeking attachment in such cases to state the nature of his claim against the defendant. See *Day v. Bennett, supra,* 18 *N. J. L.,* at *page* 288.

In 1901, the Legislature undertook a substantial revision of the attachment statutes. *L.* 1901, *c.* 74, commonly known thereafter as the Attachment Act, was adopted, which provided that an attachment might issue:

"(1) where the plaintiff, his agent or attorney, shall make affidavit that he verily believes the debtor absconds from his creditors, and is not to deponent's knowledge or belief, resident in this state at the time, and that he owes to the plaintiff a debt, specifying, as nearly as practicable, the amount thereof, or has incurred a penalty under a statute, which penalty and statute shall be specified; (2) where the plaintiff, his agent or attorney, shall make affidavit that the debtor is not to deponent's knowledge or belief resident in this state at the time, and that he owes to the plaintiff a debt, specifying as nearly as practicable, the amount thereof, or has incurred a penalty under a statute, which penalty and statute shall

be specified; (3) where a court or a judge thereof, or a supreme court commissioner shall make an· order for the issue of an attachment upon proof, by affidavit, of fraud which would warrant an order for a *capias ad respondendum;*"

The effect was to continue the remedy in the same form against absent or absconding debtors owing liquidated amounts on contracts or statutory penalties, but because the title of the 1901 act stated that its purpose was "for the relief of creditors against absent and absconding debtors," it was shortly thereafter held that the third subsection, *i. e.,* that portion of the Attachment Act derived from the statute of 1893, could not apply to fraudulent debtors who were resident in the State. *Dixon v. Abren,* 25 *N. J. L. J.* 172 (*Sup. Ct.* 1902). This defect was corrected, however, by *L.* 1903, *page* 70, *c.* 46, which added the word "fraudulent" to the title of the Attachment Act, in effect reintroducing the remedy provided by the act of 1893. It continued to be held under the Attachment Act that the writ would issue only in the case of liquidated claims and that, except to the extent that specification of the cause of action was required under *L.* 1901, *c.* 74, § 1(3), *i. e.,* that portion of the statute providing a remedy against fraudulent debtors, the affidavit need not state or specify the nature of the creditor's cause of action against the debtor. *Hotel Registry Realty Corp. v. Stafford,* 70 *N. J. L.* 528 (*Sup. Ct.* 1904) ; *Robinson v. Mellon,* 2 *N. J. Misc.* 1184 (*Sup. Ct.* 1924).

In 1903, by *L.* 1903, *c.* 247, § 84 *et seq.,* without affecting the remedies existing under the Attachment Act, *Hotel Registry Realty Corp. v. Stafford, supra,* the act gave additional breadth to the remedy of attachment. By this statute, as amended *L.* 1907, *c.* 114, it was provided that any person, whether his cause of action against defendant sounded in contract or in tort or whether his demand was for a liquidated or an unliquidated amount, was entitled to a writ of attachment

"against the property, real and personal, of any person, corporation or organization against whom or which a writ of summons might

issue, upon proof, by affidavit or otherwise to the satisfaction of the court \* \* \* establishing (*inter alia*) :

 a. The facts on which plaintiff would be entitled to an order holding defendant to bail \* \* \* [under the provisions of the statute dealing with writs of *capias ad respondendum*]

 b. That plaintiff has a cause of action, the nature and particulars of which he shall specify, and that defendant absconds from his creditors or is a nonresident of this state, and that summons cannot be served on him ; \* \* \* or

 c. That a cause of action existed against a decedent which survives against his heirs or devisees, and that they or some of them are unknown or nonresident, and that there is property in this state by law liable to answer such cause of action."

Under this statute, plaintiff's affidavit was required to state the nature and particulars of his cause of action against defendant. *Harris, Pleading & Practice in New Jersey* (*Rev. ed.* 1939), § 182. Both the Attachment Act (*L.* 1901, *c.* 74) and the 1903 statute quoted above, commonly referred to in connection with attachments as the Practice Act, were incorporated in the *Revision of* 1937, the former as *R. S.* 2 :42–1 *et seq.,* and the latter as *R. S.* 2 :42–72 *el seq.*

In addition to the difference in grounds on which the writ might issue and the different contents required in the applicant's affidavits, other matters distinguished the Attachment Act from the Practice Act. The Practice Act attachment served as an original process and was followed by a complaint, while the Attachment Act required a complaint only if the debtor entered an appearance. *Bradner, New Jersey Law Practice* (1940), §§ 88, 460. Moreover the Practice Act procedure was a form of limited attachment, enuring to the benefit of the attaching creditor only, but the Attachment Act provided relief for applying creditors and in that sense was a general attachment. *Marsh, Special Proceedings at Law,* in *The New Practice* (*Schnitzer ed.* 1949), 189–191. There were also procedural differences of importance. See, generally, *Harris, Pleading and Practice in New Jersey* (*Rev. ed.* 1939), § 130 *et seq.* The Attachment Act and Practice Act proceedings were not interchangeable. *Barrell Mfg. Co. v. Kitchell,* 84 *N. J. L.* 326

(*E. & A.* 1913); an action initiated under one of the acts had to continue under the procedure set out therein. *Bradner, New Jersey Practice* (1940), § 435.

The two forms of attachment were combined into one by *L.* 1948, *c.* 358, which became *R. S.* 2:42–86 *et seq.,* and *R. S.* 2:42–1 to 85 were repealed. *L.* 1948, *c.* 358, *s.* 45. The new statute "was something of a hybrid between the two former types of attachment," making it "difficult to ascertain * * * which one of the former procedures and theories of attachment * * * [had become] predominant in the new procedure." *Marsh, Special Proceedings at Law,* in *The New Practice (Schnitzer ed.* 1949), 191. The 1948 statute described both the circumstances under which the writ might be issued and the procedure to be followed with respect thereto. The court rule dealing with attachment, *Rule* 3:72 (now *R. R.* 4:77) followed in general terms the statutory procedure. *Marsh, op. cit., supra,* at *p.* 191.

Concerning the circumstances under which a writ of attachment might issue, the 1948 statute, above referred to, provided that

"A writt of attachment may issue * * * upon proof, by affidavit * * * to the satisfaction of the court * * * establishing; (*inter alia*)

a. The facts on which plaintiff would be entitled to an order in a civil action that a writ of *capias ad respondendum* issue * * *; or

b. That plaintiff has a cause of action, the nature and particulars of which he shall specify, and that defendant absconds from his creditors or is a nonresident of this State, and that summons cannot be served on him * * *; or

c. That a cause of action existed against a decedent which survives against his heirs or devisees, and that they or some of them are unknown or nonresident, and that there is property in this State by law liable to answer such cause of action; or

d. That plaintiff has a liquidated claim against the defendant, the nature and particulars of which he shall specify, and that the defendant is a nonresident of this State; or

e. That plaintiff has a claim of an equitable nature in which a money judgment is demanded against the defendant, the nature and particulars of which he shall specify, and that the defendant is a nonresident of this State." *R. S.* 2:42–88.

In *Mueller v. Seaboard Commercial Corp.*, 5 *N. J.* 28 (1950), in which a writ was sought under *R. S.* 2:42–88, *subd. b* which expressly conditions the writ on plaintiff's having a cause of action, the nature and particulars of which were to be specified, it was held that the affidavits must state a *prima facie* case against the defendant or the writ would be discharged. It was said:

"Where a motion to dissolve or quash an attachment is based upon the original papers on which the attachment was granted, the averments contained in such papers are to be deemed true, and all legitimate deductions and inferences from what appears in such papers must be made and construed in favor of plaintiff, and if such papers show a *prima facie* case for the attachment this is sufficient." 5 *N. J.*, at *page* 32.

See also *May v. Huff*, 12 *N. J. Super.* 418, 423 (*Cty. Ct.* 1951).

In the 1952 revision of *Title* 2 of the *Revised Statutes*, the attachment statute was altered in a manner which suggests that the motivating purpose was to remove from the statute essentially procedural mechanics which it formerly contained and which were now recognized, see *Winberry v. Salisbury*, 5 *N. J.* 240 (1950), to be properly a matter for court rule. See 4 *N. J. Practice, Marsh & Fischler Practice Forms* (1960), § 2143. The revision affected that part of the statute controlling the circumstances under which attachment might issue. This section as it currently exists, *N. J. S.* 2A:26–2, has been quoted above.

It may be seen that in *N. J. S.* 2A:26–2, unlike in its predecessor *R. S.* 2:42–88, an affidavit no longer is expressly required. Consequently *N. J. S.* 2A:26–2, *subd. b,* which encompasses the grounds formerly provided for by *R. S.* 2:42–88, *subds. b* and *d,* does not expressly require that plaintiff state the nature and particulars of his cause of action against defendant. The requirement of an affidavit is established by rule, *R. R.* 4:77–1(a), but the rule merely states that the affidavit must demonstrate "proof to the satisfaction of the court, establishing plaintiff's right to the

writ." *R. R.* 4:77-1 (*a*). Is it still required, therefore, that the plaintiff's affidavit must state the nature and particulars of his cause of action against defendant where the writ is sought under *N. J. S.* 2*A*:26-2, *subd. b*? In other words, is the plaintiff entitled to a writ of attachment under *N. J. S.* 2*A*:26-2, *subd. b* without stating a *prima facie* case against the defendant?

The question essentially is whether the statute states the sole requirements for the issuance of an attachment or whether an additional requirement, *i. e.*, that plaintiff must have a cause of action against the defendant which the plaintiff must specify and describe in his affidavit, is to be interpolated into the words of the statute. If the writ might issue irrespective of the validity of plaintiff's cause of action against the defendant, then it is apparent that if defendant is to save his property which is attached from being disposed of by sale to satisfy plaintiff's asserted damages the defendant must answer plaintiff's complaint or move to dismiss the complaint or for summary judgment, any of which, involving a contest on the merits, will subject defendant to the personal jurisdiction of the court, which of course is not the case if defendant does not appear or appears only by motion to discharge the writ. *B. R. Waldron & Sons Co., Inc. v. Venezia,* 31 *N. J.* 161, 164 (1959). If, on the other hand, it is an essential requirement for the issuance of the writ that plaintiff state a cause of action against defendant in his affidavit filed to secure the writ, then the defendant may by motion to discharge the writ test the merits of plaintiff's cause of action, at least insofar as to require the latter to show that he is *prima facie* entitled to recovery, and yet still avoid incurring the personal jurisdiction of the court. See *B. R. Waldron & Sons Co., Inc. v. Venezia, supra.*

We conclude that a plaintiff seeking an attachment under *N. J. S.* 2*A*:26-2, *subd. b* must demonstrate, in order to be entitled to the writ, in addition to the other statutory requirements, that he has a *prima facie* cause of action

against the defendant. Such proof was an express require-
ment of the statute in certain circumstances until the re-
vision of 1952. *Mueller v. Seaboard Commercial Corp.,*
5 *N. J.* 28 (1950). In the 1952 revision, in attempting
to remove purely procedural demands from the statutes, it
was natural for the Legislature to delete the language re-
quiring "the nature and particulars" of the cause of action
to be specified. And apparently in combining into the new
statute at *N. J. S.* 2*A*:26–2, *subd. b* the terms of *R. S.*
2:42–88, *subd. b* relating to all causes of action against
absent or absconding debtors and *R. S.* 2:42–88, *subd. d,*
relating to liquidated claims against nonresident debtors,
it was felt to be expedient to drop all mention of the nature
of the plaintiff's claim. But it has never been considered
that it was the purpose of the changes made by the 1952
revision to affect the substantive grounds which entitled the
plaintiff to the remedy of attachment. In *Original R. & R.
Empire Pickle Works v. Prodotti Alimentari, G. Arrigoni
& C., Societa Per Azioni,* 28 *N. J. Super.* 405 (*App. Div.*
1953) decided after the 1952 revision of Title 2, it was said:

"In 1948 a single Attachment Act, *N. J. S. A.* 2:42–86 *et seq.,*
was enacted in lieu of the two statutes then on the books * * *.
On January 1, 1952 *Title 2A* became law, erasing that provision
[requiring the plaintiff to specify in his affidavit 'the *nature and
particulars of*' his action] from the statutes. Nevertheless *R. R.*
4:77–1 requires the affidavit to contain 'proof to the satisfaction of
the court, establishing the plaintiff's right to the writ.' Certainly
the law will place no heavier demands upon the plaintiff than that
he set up in the affidavit a bare *prima facie* case." 28 *N. J. Super.,
at page* 409.

See also *Whiteman Food Products Co. v. Prodotti Alimentari,
G. Arrigoni & C., Societa Per Azioni,* 31 *N. J. Super.* 277,
280 (*App. Div.* 1954) ; 4 *N. J. Practice, Marsh & Fischler
Practice Forms* (1960), § 2143. Under the former prac-
tice, and indeed under the subsections of the present statute
which expressly require a claim against the defendant as
a prerequisite to the issuance of a writ, *N. J. S.* 2*A*:26–2,
*subds. a, c* and *d,* see *Seiden v. Fishtein,* 44 *N. J. Super.*

370, 374 (*App. Div.* 1957); *Prozel & Steigman, Inc. v. International Fruit Distributors,* 171 *F. Supp.* 196, 200 (*D. C. D. N. J.* 1959), it was considered consistent to allow the defendant in attachment to test the merits of the plaintiff's cause of action in a limited manner and yet still remain aloof from the personal jurisdiction of the court. The substantive nature of the remedy of attachment is the same under the present statute as under the immediately preceding version. We conclude that a plaintiff, in seeking a writ of attachment under *N. J. S.* 2A:26–2, *subd. b,* is required to state in his affidavit sufficient facts to establish a *prima facie* cause of action against the defendant in attachment, and to include therein the other statutory requirements for the issuance of the writ.

## II.

### MERITS.

■ We proceed, therefore, to examine the affidavits presented in the instant case to determine whether plaintiff has stated a *prima facie* case against the defendants. In doing so, we may note, plaintiff is entitled to all inferences fairly deducible from his affidavit, and all conflicts will be resolved in his favor. *Mueller v. Seaboard Commercial Corp., supra,* 5 *N. J.,* at *page* 32; *Seiden v. Fishtein, supra,* 44 *N. J. Super.,* at *page* 374.

An affidavit made by Alexander J. Alexander, a licensed real estate broker and vice-president of the plaintiff corporation, was filed by plaintiff in support of its request for an order for a writ of attachment against defendants. This affidavit states that defendants placed an advertisement in a metropolitan New York newspaper seeking apartment house sites. Alexander contacted them to determine if they would be interested in New Jersey property and defendants indicated that they were. Alexander thereupon proceeded to search out available sites and, after discussing some with defendants, secured for them the property which is presently

under attachment. It is declared in the affidavit that during this period and later defendants "repeatedly asked" Alexander "to check available sites for one family housing developments" as to which defendants promised they would deal exclusively through plaintiff. Alexander agreed and "during the next few months * * * diligently and carefully canvassed the northern New Jersey area for such sites." Several sites were located and arrangements made for defendants to visit these, which for various reasons never occurred. On May 18, 1959, however, defendants requested that Alexander show them a property in West Orange, belonging to the Crestmont Country Club, about which Alexander had spoken to defendants on several occasions. Upon inspecting the property defendants were enthusiastic about it and "strongly urged [Alexander] to secure it for them on the best terms possible." Alexander promised to use his "best efforts to obtain it for them."

Alexander was successful in his negotiations and a contract of sale between Crestmont Country Club, Inc. and defendants was executed on July 15, 1959. The price agreed upon was $220,000. Defendants executed the contract in the name of the Construction Purchasing Co. of America, Inc., a New York corporation, two of the three stockholders of which are defendants. About five days after the execution of the contract of sale, defendants stopped payment on the check given in part payment and evinced their intent to repudiate the contract. The affidavit states that Crestmont is ready, willing and able to perform its part of the contract.

Alexander avers that he informed defendants at the beginning of his dealings with them that the usual real estate broker's commission on the sale of unimproved property in New Jersey was 10% of the sale price, but that plaintiff, if necessary to induce a sale, would accept a reasonable reduction in its commission. It was always understood that plaintiff would look to the vendor, not to defendants, for any commission in connection with any transaction negotiated for defendants by plaintiff. It is further alleged,

however, that defendants were advised that an agreement existed between plaintiff and the Crestmont Country Club, Inc. that plaintiff was to receive 8% of the sale price of the Crestmont Country Club property from the Country Club as plaintiff's commission for effecting the sale, *i. e.,* plaintiff was to receive $17,600 from the Country Club. The affidavit alleged that defendants were nonresidents of this State and that a summons could not be served upon them here.

On the basis of the above affidavit an order issuing the writ of attachment was made. Defendants filed a motion to discharge the writ and supported it with an affidavit sworn to by both defendants. In it defendants admit the negotiations between defendants, plaintiff and Crestmont Country Club, Inc.; they admit the execution of the contract and its subsequent repudiation which they claim was justified; but they deny that they ever agreed to pay plaintiff any compensation or that they were aware of the arrangements between plaintiff and the seller respecting a commission. Thereupon plaintiff, through Alexander, filed an affidavit in opposition to the motion.

This second affidavit submitted by Alexander repeats in virtually identical terms the transaction described by him in his first affidavit. In addition, the second affidavit states that defendants at all times dealt with Alexander as individuals and not in behalf of a principal. Alexander admits that on a prior occasion defendants arranged to take title to the property in the name of the Construction Purchasing Co. of America, Inc., which they said was a corporation owned and controlled by them. Alexander also admits that one of the defendants advised him that they might execute the contract of sale for the Crestmont property in a corporation rather than in their own names, which in fact occurred. It is also alleged by Alexander that defendants stated they might, as before, have the Construction Purchasing Co. of America, Inc. assign the contract of sale to them and take title in their own names.

We must apply the facts alleged in the affidavits as outlined above in light of the appropriate legal principles to determine whether they state a *prima facie* cause of action by plaintiffs against defendants.

■ In passing it may be noted that the provisions of the statute of frauds present no problem in this case since no part of that statute applies to a contract between a prospective purchaser of land and a real estate agent which provides that the latter shall act for or on account of the purchaser in securing property. See *Harrop v. Cole*, 85 *N. J. Eq.* 32 (*Ch.* 1914), affirmed 86 *N. J. Eq.* 250 (*E. & A.* 1916). Compare *R. S.* 25:1–9 which applies to the employment contracts of real estate agents "selling or exchanging real estate for or on account of the owner."

■ Plaintiff's affidavits reveal facts and circumstances from which it may be implied that defendants employed plaintiff to obtain lands for defendants, at favorable terms, which would be suitable for the particular purpose which defendants related to Alexander, *i. e.*, a housing development of substantial one family residences. The affidavits justify the inference that, in exchange for these services, defendants would, if plaintiff found lands satisfactory to them, complete and perform an agreement of sale with the vendor so that plaintiff might earn a commission from the vendor. It makes no difference that plaintiff and defendants agreed that the defendants should pay no commissions to plaintiff. Damages which may be recovered by plaintiff on its action against defendants may be measured by the amount of commission which would have been earned had defendants performed according to their agreement, but recovery will not be predicated on an agreement of defendants to pay plaintiff commissions. Defendants agreed to act so as to allow plaintiff to earn a commission from some third party, and, if the affidavits be correct and if defendants have no defense to the contract we find to exist here on the basis of the facts alleged, it is on this agreement that defendants are liable, the damages being measured by the amount of

commission plaintiff would have earned had defendants performed as agreed.

The principles discussed above have been applied by other courts to allow recovery in situations similar to the instant case. In *Cavender v. Waddingham,* 2 *Mo. App.* 551 (*Ct. App.* 1876), the defendant had employed plaintiffs to purchase property at stipulated terms on defendant's account. Plaintiffs were to obtain their compensation from the vendor, not the defendant. The court held that plaintiffs were entitled to recover on these facts, stating:

"When the plaintiffs were employed by the defendant to effect a purchase for his benefit, they undertook to do so for a consideration, which was clearly understood. This was that, in the event of success, they were to be compensated according to the usage of their business, by a percentage upon the amount of purchase money. The defendant said to them, in effect: 'You procure the consent of the property owners to sell to me upon the terms indicated. I undertake, on my .part, to consummate the trade by ·paying the purchase money, so that you will realize your commissions.' The defendant's undertaking to take and pay for the property, so that plaintiffs would get their compensation, was as emphatic and as binding as if he had agreed to pay the commissions himself. Can he deliberately violate that obligation, and then set up his own dereliction as a reason why the other contracting parties shall lose their earnings?" 2 *Mo. App.,* at *page* 554.

In *Eells Bros. v. Parsons,* 132 *Iowa* 543, 109 *N. W.* 1098 (*Sup. Ct.* 1906), the real estate agent agreed with the purchaser that the former would accompany the latter to inspect certain land which the purchaser would buy if it suited him. The real estate agent was to obtain his commission from the vendor. After inspecting the land, and accepting the real estate agent's services, the purchaser signed an agreement of sale which he later breached, depriving the real estate agent of commissions he would otherwise have received from the vendor. Upon the agent's suit the purchaser demurred and the trial court sustained the demurrer. On appeal, the decision was reversed. The execution of the contract of sale, the court stated, gave rise to a cause of action in favor of the real estate agent for

the commissions of which he was deprived by the purchaser's failure to perform. The court said:

"What he (defendant) did agree to do was to purchase the land which suited him, thus enabling the plaintiff to earn its commission. The parties understood when they made the contract what plaintiff's damages would be in the event defendant failed to perform it. In other words, loss of plaintiff's commission was within the contemplation of the parties in the event of defendant's failure to perform." 109 N. W., at page 1098.

In *Brawner v. Cumbie*, 264 S. W. 497 (*Tex. Civ. App.* 1924), the court held for the plaintiff on a claim similar to that made in the instant case. The court stated:

"The right of recovery of such claim does not rest on the promise of the employer to so compensate the agent, but upon the theory that he impliedly agrees that he will perform the main contract which the broker engages to negotiate, and will thus afford him an opportunity of securing payment from the other side; and a breach or refusal by the employer to perform the main contract renders it impossible for the broker to become entitled to payment from the other party, in consequence of which he is damaged to that extent. It is therefore a suit for damages for a breach of contract by the employer, which he necessarily knows will result in injury to the broker to the extent of the loss of the commission due him from the opposite party." 264 S. W., at pages 499–500.

In *McKnight v. McGuire*, 117 *Misc.* 306, 191 N. Y. S. 323 (*Sup. App.* 1921), the plaintiff, a real estate agent, agreed with the defendant, a prospective lessee, to attempt to obtain premises in which defendant was interested on terms stipulated by defendant. The plaintiff was successful in obtaining the owner's consent to defendant's terms, but the defendant refused to complete the transaction. Plaintiff sued defendant and the New York Supreme Court, Appellate Term, in an opinion by Judge Lehman, affirmed, the judgment entered in plaintiff's favor in the trial court, stating:

"It seems clear that if the defendant employed the plaintiff to submit an offer to the owner of the premises, and agreed with the plaintiff that if plaintiff procured a lease for him upon acceptable terms he would rent the premises, and if at that time he was aware

of the fact that the plaintiff would thereby obtain a commission from the owner of the premises, he is liable in damages for the breach of his agreement with the plaintiff * * *.

The case is not one where a broker merely brings to a possible purchaser or lessee an offer to sell or lease on behalf of the owner, to be accepted or refused by the proposed customer, for in this case the broker was endeavoring to find property for sale or lease which would be satisfactory to this defendant, and he was authorized to carry the offer of the defendant to the owner. The defendant undoubtedly knew that the plaintiff was performing these services in the hope of profit, and he also undoubtedly knew that ordinarily the broker looks to the owner for his commissions, and that therefore the plaintiff would become entitled to the commissions from the owner, if the defendant's offer to lease was accepted." 191 N. Y., at *page* 324.

See also *Livermore v. Crane,* 26 *Wash.* 529, 67 *P.* 221, 57 *L. R. A.* 401 (*Sup. Ct.* 1901); *Calkins v. F. W. Woolworth Co.,* 27 *F. 2d* 314 (8 *Cir.* 1928); *Danciger Oil & Refining Co. v. Wayman,* 169 *Okl.* 534, 37 *P. 2d* 976, 97 *A. L. R.* 854 (*Sup. Ct.* 1934); *Morgan v. Whalley & Whalley,* 205 *Ala.* 170, 87 *So.* 846 (*Sup. Ct.* 1920); *James v. Home of Sons and Daughters of Israel,* 153 *N. Y. S.* 169 (*Sup. App. T.* 1915); *Darling v. Moscowitz,* 159 *N. Y. S.* 672 (*Sup. App. T.* 1916).

In the affidavits filed on its behalf in the instant case, plaintiff alleged that defendants employed it for a specific purpose, *i. e.,* to locate suitable lands on suitable terms which defendants could buy. It was also alleged that, although plaintiff was to obtain its commissions from the vendor, the defendants were aware of this arrangement and were also aware of the approximate, if not the exact, amount which plaintiff was to receive. See *Morgan v. Whatley & Whatley, supra,* 87 *So.,* at *page* 848. The following cases denied recovery by the real estate agent from the purchaser: *Brockway-Mecklenburg Co. v. Hilderman,* 90 *Mont.* 317, 2 *P. 2d* 1018 (*Sup. Ct.* 1931); *Kinscherf v. Bistis,* 105 *Misc.* 126, 173 *N. Y. S.* 547 (*Sup. Ct.* 1918); *Messer-Johnson Realty Co. v. Newman,* 210 *Ala.* 340, 98 *So.* 20 (*Sup. Ct.* 1923), but they are readily distinguishable from the instant case, how-

ever, because they were expressly grounded on the failure of the real estate agent to show that an agreement existed between himself and the purchaser. In those cases, no contract, expressed or implied, existed between the agent and the purchaser, which is not, as we have stated above, the situation in the instant case. . Compare *McCue v. Deppert*, 21 *N. J. Super.* 591 (*App. Div.* 1952).

Defendants argue that the contract of sale with Crestmont Country Club, Inc., was with the Construction Purchasing Corporation of America, Inc., rather than with defendants personally, and that defendants were always acting on behalf of that corporation. This means, it is contended, that plaintiff's cause of action, if one exists at all, is against the corporation. It suffices to say that the affidavits filed on plaintiff's behalf allege that, to plaintiff's knowledge, defendants were acting as individuals and that the corporation existed merely as a nominee to take title in defendants' behalf.

We hold, therefore, that the affidavits filed on plaintiff's behalf in the instant case state a *prima facie* cause of action in favor of plaintiff and against defendants. Furthermore, it appears from the affidavits, and the defendants apparently admit, that the other statutory requirements for the issuance of the writ exist, *i. e.*, that defendants are nonresidents and that summons cannot be served upon them in this State. Plaintiff was entitled, therefore, to the issuance of the writ.

The order of the Superior Court, Law Division, granting defendants' motion to vacate plaintiff's writ of attachment in the instant suit is reversed, and the cause is remanded to the trial court for proceedings not inconsistent with this opinion.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.