**CONSTRUCTION DRILLING, INC. and Thomas R. Crofts, Plaintiffs,**

v.

**Eugene G. CHUSID, et. al., Defendants.**

No. CIV. A. 99–3352.

United States District Court, D. New Jersey.

Aug. 31, 1999.

Thomas Weisenbeck, Bressler, Amery & Ross, Florham Park, NJ, Morristown, NJ, for Plaintiffs Construction Drilling, Inc. and Thomas R. Crofts.

Michael F. Brandman, Jean S. Lidon, Weiler & Brandman, Cranford, NJ, for Defendants Eugene G. Chusid, Boris G. Chusid, Svetlana B. Chusid, Gregory K. Chusid, Global Underwriters Inc., IEIEC World Headquarters Corporation, The Russian White House Restaurant, Inc. d/b/a All American Sports Bar & Grill, Amadon–RDC, Inc., SMDM & E, Ltd. and The World Wide Trading Group of Companies, Inc.

## Opinion

WALLS, District Judge.

### Factual Background

In August 1998, plaintiff Thomas R. Crofts, while in Venezuela on business for plaintiff Construction Drilling, Inc. ("CDI"), telephoned the "U.S. Representative Office" of Caribbean Bank of Commerce ("Caribbean Bank") in Ridgewood, New Jersey, and spoke to defendant Eugene Chusid to request information about Caribbean Bank's banking operations. Around August 19, 1998, Caribbean Bank, by telecopy, forwarded to Crofts a series of documents pertaining to the bank. Included among these documents was a financial report, which allegedly represented the following:

(1) that Caribbean Bank is a wholly owned subsidiary of Int'l Financial;

(2) that Caribbean Bank had some $195 million in assets in two branch offices, with some $162 million in deposits headquartered in St. Johns, Antigua at the time it was acquired by Int'l Financial on July 29, 1997;

(3) that Caribbean Bank has a "headquarters" in Antigua and is licensed in that jurisdiction; and

(4) that the total deposits in Caribbean Bank/Int'l Financial were $651.7 million by December 31, 1997.

Attached to the financial statement was an auditor's report signed by "James H. Chance" (purportedly a "licensed public accountant") that stated that the financials presented fairly the financial conditions of the two companies. In reliance on the financial statement and auditor's report, plaintiff CDI wired $350,000 to its account with Caribbean Bank between August and October 1998.

On October 15, 1998, in a telephone conversation between defendant Chusid in Ridgewood and Crofts in Massachusetts, Chusid advised Crofts of the availability of Caribbean Bank "investment units" being offered by Caribbean Bank of Commerce,

Ltd. (DOM), purportedly a subsidiary of Caribbean Bank. Chusid then telecopied to Crofts sales literature and a subscription agreement, which stated that "[r]edemption of Bond is guaranteed by Caribbean Bank of Commerce Ltd and First Nations Insurance Company of Alaska."

On April 12, 1999, Crofts traveled to St. John's, Antigua, and notwithstanding a diligent search, was unable to locate any presence of Caribbean Bank. CDI claims that it then demanded that Caribbean Bank close its account and wire all monies contained therein to its Citibank account in Venezuela.

On May 7, 1999, Chusid informed Crofts that he was resigning as Senior Vice President of Caribbean Bank and that he had handed CDI's account over to Michael Swartz of Caribbean Bank. He also allegedly represented that the wire transfer for $330,000 would occur as planned on June 11, 1999. On June 10, 1999, Mr. Bender, the President of Caribbean Bank, assured CDI by telephone that the wire transfer would occur on June 11, 1999. However, by telecopy dated June 10, 1999, Swartz advised Crofts that:

(1) "[w]ith a heavy heart . . . as of 12:01 am St John's, Antigua time, the Caribbean Bank of Commerce, Ltd. shall cease to exist as an independent entity";

(2) Caribbean Bank was on the brink of insolvency and was merging with "Digital Commerce Bank";

(3) Caribbean Bank "elected" to no longer be licensed by Antigua and Barbuda;

(4) Eugene Bender had resigned as President and was being replaced by Alexander Ivanov; and

(5) Digital Commerce Bank would be managed out of Moscow, Russia with a satellite office in St. Vincent, WI.

In the same telecopy, CDI and Crofts were offered either stock in the new bank or a zero coupon bond with the new bank, payable in five years.

Needless to say, neither CDI nor Crofts received a wire transfer on June 11, 1999. However, on June 15, 1999, Bender sent a letter to Crofts that stated that the merger was designed in such a manner that "No Depositor Will Lose Their (sic) Deposit". On June 24, 1999, Swartz informed the plaintiffs that if a response to the offer of stock or bonds in the new bank were not received by the close of business July 2, 1999, the bank would issue for the value of their accounts 50% in stock and 50% in bonds. On June 29, 1999, plaintiffs informed Swartz that they were not yet prepared to make an election as to which option they preferred. On July 1, 1999, Swartz informed plaintiffs that they must make a selection by the end of business July 9, 1999 and that after that date "all account holders shall be issued for value of your account 50% in form of bonds and 50% in form of stock in the name of your account."

Later, the plaintiffs discovered that:

(1) Caribbean Bank's International Banking License had been revoked in April, 1998, and a Special Alert had been issued by the FDIC regarding Caribbean Bank in May 1998;

(2) the bank had been struck from the Antigua and Barbuda register of international business corporations;

(3) the bank had received a license from an allegedly non-recognized sovereignty known as the "Dominion of Melchizedek";

(4) the bank was using an address in the United States unauthorized by any state or federal banking authority; and

(5) "First Nations Insurance Company of Alaska" allegedly did not exist.

In their complaint, the plaintiffs alleged violations of Federal and state RICO statutes, theft by deception, fraud, breach of fiduciary duty, trover and conversion, unjust enrichment, conspiracy and aiding and abetting, violation of New Jersey's Consumer Fraud Act, and breach of contract. On July 16, 1999, this Court signed an

order to show cause granting the plaintiffs a writ of attachment against real and personal property of the defendants and a preliminary injunction barring the defendants from transferring their interests in such property. Defendants now move to vacate this order and cross-move for summary judgment and to strike certain allegations made by the plaintiff concerning an unrelated lawsuit by Citibank against the defendants. In their reply, plaintiffs request that this court declare inadmissible certain foreign documents submitted as evidence by the defendants.

1. *Relief from Order of Attachment*

■ The Federal Rules of Civil Procedure provide that a party may obtain relief from an order in cases involving mistake, or "any other reason justifying relief from the operation of the judgment." Fed. R.Civ.P. 60(b)(1) and (6). The defendants contend that the Court erred in issuing the writ of attachment because there are no statutory grounds for the issuance of the writ, and because there is no probability that final judgment will be rendered in favor of the plaintiffs, as required by Rule 4:60–5(a) of the New Jersey Civil Practice Rules.

Under Fed.R.Civ.P. 64, federal courts look to state law to determine the statutory grounds governing attachment. N.J.S.A. Sec. 2A:26–2(a) provides that attachment is appropriate "where the facts would entitle plaintiff to an order of arrest before judgment in a civil action ... except that, in actions founded upon a tort, an attachment shall not issue against a corporation upon which a summons can be served in this state." In turn, N.J.S.A. Sec. 2A:15–42(d) authorizes the issuance of a writ of attachment in an action founded upon express or implied contract when the defendant has fraudulently contracted the debt or incurred the demand.

Defendants argue that there were no statutory grounds for attachment under N.J.S.A. Sec. 2A:15–42(d) because no contractual relationship existed between CDI and the Chusids. Instead, the defendants claim that the "foreign company" Caribbean Bank was the actual contracting party. In support of their argument that a direct contractual relationship between the parties must be demonstrated as a prerequisite to attachment, defendants rely primarily on *Allied Financial Corp. v. Steel Panel Sales Corp.,* 86 N.J.Super. 65, 78, 205 A.2d 904 (App.Div.1964), *cert. denied,* 44 N.J. 411, 209 A.2d 144 (1965). Contrary to defendants' narrow interpretation, this case holds that "[t]he gravamen of the ensuing cause of action ... need not consist of a breach of the contract between the parties in the ordinary sense; it may be constituted by fraudulent treatment of the plaintiff by the other party during the relationship." *Id.* at 80, 205 A.2d 904; *see also Hamilton v. Schwadron,* 82 N.J.Super. 493, 198 A.2d 128 (App.Div.1964).

Plaintiffs counter that Caribbean Bank did not actually exist but was merely a fictitious corporation that the Chusids used as an alter ego. They thus assert that the true parties to the other side of the contract were the Chusids. In order to warrant the attachment remedy, the plaintiffs are required to present only a prima facie case that a contractual relationship existed between themselves and the defendants. *See Allied Financial Corp.,* 86 N.J.Super. at 79–81, 205 A.2d 904. A writ may be issued after consideration of the moving papers and any opposing affidavits. Fed. R.Civ.P. 60(a).

The plaintiffs have met this burden. The individual and corporate plaintiffs have presented evidence that shows, *inter alia,* that they applied for accounts with Caribbean Bank on August 20, 1998, and that the existence of the new accounts was confirmed in writing by Eugene Chusid on the same day. Furthermore, the defendants' contention that the Chusids were not the real contracting parties is belied by plaintiff's evidence and defendants' admissions that the Chusids incorporated International Financial, the admitted parent company of Caribbean Bank; that the

Chusids were the sole signatories on a bank account opened in the name of "International Financial Holdings, Ltd. d/b/a Caribbean Bank of Commerce"; and that Eugene Chusid managed the deposits of the bank. The plaintiffs have thus made out a prima facie case that a contractual relationship existed between CDI and the Chusids, which is sufficient to merit the writ of attachment pursuant to N.J.S.A. 2A:15–42(d).

Defendants also claim that the plaintiffs have not demonstrated a probability of final judgment because they failed to prove actionable fraud. Here again, the plaintiffs need present only a prima facie case. *See Tanner v. Ciraldo*, 33 N.J. 51, 161 A.2d 725 (1960); *Britton v. Howard Savings Bank*, 727 F.2d 315 (3rd Cir.1984). The plaintiffs have submitted uncontroverted affidavits that allege that Caribbean Bank financial statements failed to disclose that the bank's license had been revoked by the Government of Antigua and Barbuda, and that plaintiffs relied on these financial reports. In addition, the plaintiffs have presented credible evidence that they suffered damages of $350,000 due to the defendants' misrepresentations. Because the plaintiffs have made out a prima facie case of fraud, they have demonstrated a probability that final judgment will be rendered in their favor as required by New Jersey Civil Practice Rule 60–5(a). Defendants' cross-motion to vacate the writ of attachment is therefore denied.

### 2. Relief from Preliminary Injunction

When ruling on a motion for a preliminary injunction, courts consider the following factors: 1) the likelihood that plaintiff will prevail on the merits at the final hearing; 2) the extent to which plaintiff is being irreparably harmed by the conduct complained of; 3) the extent to which defendant will suffer irreparable harm if the preliminary injunction is issued; and 4) the public interest. *See, e.g., Pappan Enterprises v. Hardee's Food Systems, Inc.*, 143 F.3d 800 (3rd Cir.1998).

Defendants seek to vacate the preliminary injunction entered by this court on the basis that the plaintiffs cannot demonstrate irreparable injury. In *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3rd Cir.1990), the Third Circuit held that a plaintiff can meet this burden by showing a likelihood that a money judgment will otherwise go unsatisfied. *Id.* at 194–206. The Third Circuit has further held that a preliminary injunction is warranted in cases in which such relief is the only apparent way to make plaintiffs whole, particularly where the party subject to the injunction had a history of fraud relating to the plaintiffs' assets. *Elliott v. Kiesewetter*, 98 F.3d 47, 58 (3rd Cir.1996).

In the present case, the defendants have failed to present evidence that they will be able to satisfy a money judgment, in absence of the temporary restraints on their assets. In fact, in their reply brief, defendants admit that two of the four Chusids named as defendants claim to be either incompetent or unemployed. Particularly in light of the plaintiffs' serious allegations of defendants' fraud, including tampering with evidence presented to this court, this court finds that plaintiffs have adequately shown a likelihood of irreparable injury sufficient to support the injunction.

Defendants also claim that they will suffer substantial harm because of the injunction. In considering this factor, courts balance the hardships to the respective parties. *See, e.g., Pappan Enterprises, Inc. v. Hardee's Food Systems*, 143 F.3d 800, 805. In this case, the defendants have produced no evidence of potential harm caused by the injunction, but merely assert that they will not be able to profit from selling their New Jersey real estate during an "especially advantageous" market period. Such a transfer of the defendants' assets, potentially beyond the reach of this court, is precisely the danger that the preliminary injunction is designed to avert. The defendants' claim of substantial hardship thus fails.

Finally, the defendants urge the court to re-evaluate the scope of the temporary restraints in light of the requirement that the value of the encumbered assets reasonable relate to the likely value of the expected judgment. *See, e.g., Hoxworth,* 903 F.2d at 198. In order to meet this standard, the court is not required to perform a precise calculation of the defendants' ultimate liability. *United States v. Keystone Sanitation Co.,* 903 F.Supp. 803, 810 (M.D.Pa.1995). Nor need the court determine the exact value of the encumbered assets. *Marsellis–Warner Corp. v. Rabens,* 1999 WL 427495 (D.N.J.1999). While the plaintiffs in this case seek damages of over $1,050,000, the defendants in this case have not produced evidence that adequately demonstrates the value of their frozen assets. Particularly in light of the limited scope of the injunction, which permits both the individual and corporate defendants to expend funds necessary for household, family, or ordinary business expenses, this court declines to re-evaluate the scope of the temporary restraints.

Because the defendants have not shown that this court erred in issuing the preliminary injunction, nor presented any other reason justifying relief from the order pursuant to Fed.R.Civ.P. Sec. 60(b), their cross-motion to vacate the order is denied.

### 3. *Striking the Citibank Allegations*

■ The defendants seek to strike the portions of Crofts' declaration that are based upon a separate lawsuit against the Chusids by Citibank, claiming that these allegations are outside of Crofts' personal knowledge and irrelevant to the present action.

New Jersey Local Civil Rule 7.2(a) provides that affidavits shall be restricted to statements of fact within the personal knowledge of the affiant. The allegations in the Crofts declaration concerning the purported "Citibank scam" are supported only by the complaint in the Citibank case and supporting declarations. Even assuming that the Citibank allegations might be relevant to the present action, Crofts' attempts to rely on allegations about which he admittedly has no personal knowledge must fail. Furthermore, this court declines to take judicial notice of these allegations, because the facts alleged cannot fairly be characterized as "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" pursuant to Fed.R.Evid. 201(b)(2).

The defendants' motion to strike paragraphs 40–50 of Crofts' Declaration in Support of his Order to Show Cause is therefore granted.

### 4. *Defendants' Foreign Documents*

■ In their reply brief, the plaintiffs claim that the foreign public documents submitted by the defendants are inadmissible because they fail to meet the requirements for self-authentication under Fed.R.Evid. 902(3) and Fed.R.Civ.P. 44(a)(2). Fed.R.Evid. 902(3) provides that a foreign public document is considered self-authenticating if: 1) it is evidenced by an official publication; or 2) it purports to be executed in an official capacity by a person authorized to do so by the laws of the foreign country *and* is accompanied by a final certification of genuineness by a diplomatic or consular agent of the United States, or by a diplomatic or consular official of the foreign country assigned or accredited to the United States. Fed.R.Civ.P. 44(a)(2) contains parallel provisions governing proof of foreign official records.

■ The defendants have submitted numerous documents that purport to show that the Dominion of Melchizedek is a "recognized ecclesiastical sovereignty," that Caribbean Bank was licensed to conduct business by the governments of Melchizedek and of Antigua and Barbuda, and that the First Nations Insurance Company of Alaska was properly authorized and established by the Kuiu Thlingit Nation of Alaska. Plaintiffs contend that none of these documents is self-authenticating un-

der Fed.R.Evid. 902(3) or Fed.R.Civ.P. 44(a)(2) because each lacks the required final certification.

Only three of defendants' submissions are even arguably self-authenticating under the federal rules. First, the order of the High Court of Justice of Antigua and Barbuda stating that Caribbean Bank was improperly struck from the register of international business corporations (Certification of Eugene Chusid, Exhibit J) appears to be an official publication sufficient to satisfy Fed.R.Civ.P. 44(a)(2). *See* Supplementary Note of Advisory Committee Regarding Rule 44 ("a document that, on its face, appears to be an official publication, is admissible, unless a party opposing its admission shows that it lacks the character.") It is thus admissible as a self-authenticating document.

Second, the defendants have submitted evidence in an attempt to establish that the Dominion of Melchizedek is a "recognized ecclesiastical sovereignty". Such evidence consists primarily of a certificate of good standing from Nevada concerning the Phoenix Summas Corporation that states that the corporation was "duly organized under the laws of Dominion of Melchizedek" (Certification of David Korem, Exhibit E). Although the Nevada certificate does not establish that the purported sovereignty exists, it does contain a certification by the custodial officer and thus meets the standard for a self-authenticating domestic official record pursuant to Fed.R.Civ.P. 44(a)(1). Although the plaintiff's efforts to challenge the authenticity of this document fail, the defendants have produced no credible evidence of the existence of the Dominion of Melchizedek.

In contrast, Caribbean Bank's purported license to conduct business in Antigua and Barbuda is not self-authenticating because it does not contain the required certification (Certification of Eugene Chusid, Exhibit I). Although Fed.R.Civ.P. 44 permits authentication of official records pursuant to the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents, plaintiffs correctly note that the Convention requirement of an "apostille" [1] issued by a competent authority of the Government of Antigua and Barbuda is not satisfied. Furthermore, the defendants have failed to authenticate this document by producing extrinsic evidence of its accuracy. This document is therefore inadmissible on its face.

The defendants have failed to produce extrinsic evidence to authenticate any of the foreign documents challenged by the plaintiffs. Because the remainder of the challenged documents are not authenticated in any way, this court rejects them as inadmissible.

### Conclusion

Because the defendants have failed to establish error or other grounds for relief under Fed.R.Civ.P. 60(b), the court denies the defendants' cross-motion to vacate the July 16, 1999 Order to Show Cause granting the plaintiffs a writ of attachment and a preliminary injunction, and for summary judgment. Because the plaintiff's allegations concerning the "Citibank scam" are unsupported by affidavits based on personal knowledge, the court strikes paragraphs 40–50 of Crofts' Declaration. Finally, the court finds that the following evidence presented by defendants concerning Caribbean Bank, the Dominion of Melchizedek, and the First Nations Insurance Company of Alaska is inadmissible: 1) Caribbean Bank's apparent license from the Dominion of Melchizedek (Korem Certification Exhibit A); 2) the letter from the Central African Republic purportedly recognizing

1. Fed.R.Civ.P. 44(a)(2) permits the self-authentication of foreign documents according to the provisions of a treaty or convention to which the United States and the foreign country are parties. The Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, Article 4, provides that foreign public documents may be authenticated by a certification issued by a competent authority of the foreign state, and entitled in French "Apostille (Convention de La Haye du 5 octobre 1961)." ·

**516**

the Dominion of Melchizedek (Korem Certification Exhibit D); 3) the Memorandum of Understanding between a Philippine Presidential Commission and the Dominion of Melchizedek (Korem Certification Exhibit F); 4) an attorney's letter concerning the Caribbean Bank license (Chusid Certification Exhibit K); and 5) documents from the "Kuiu Thlingit Nation" purporting to authorize the First Nations Bank of Alaska (Chusid Certification Exhibits M and N).

## ORDER

By Order to Show Cause dated July 16, 1999, this court granted the plaintiffs a writ of attachment and a preliminary injunction barring the defendants from transferring their interests in certain real and personal property. Defendants have moved to vacate the order and cross-moved for summary judgment. Defendants also have moved to strike the allegations from plaintiff Crofts' declaration that are not based on personal knowledge. Plaintiffs have cross-moved to request that the court declare inadmissible certain foreign documents submitted by defendants.

The defendants' motion to vacate the July 16, 1999 Order and for summary judgment is denied. The defendants' motion to strike paragraphs 40–50 of Crofts' declaration is granted. Finally, the court finds that the following documents proffered by defendants are inadmissible: 1)

1) Caribbean Bank's apparent license from the Dominion of Melchizedek (Korem Certification Exhibit A); 2) the letter from the Central African Republic purportedly recognizing the Dominion of Melchizedek (Korem Certification Exhibit D); 3) the Memorandum of Understanding between a Philippine Presidential Commission and the Dominion of Melchizedek (Korem Certification Exhibit F); 4) an attorney's letter concerning the Caribbean Bank license (Chusid Certification Exhibit K); and 5) documents from the "Kuiu Thlingit Nation" purporting to authorize the First Na-

tions Bank of Alaska (Chusid Certification Exhibits M and N).