**BEHRING INTERNATIONAL, INC., Plaintiff,**

**v.**

**IMPERIAL IRANIAN AIR FORCE, etc., et al., Defendants.**

**Civ. A. No. 79–675.**

United States District Court, D. New Jersey.

Aug. 13, 1979.

Robert W. Delventhal, James M. Terranova, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for plaintiff.

F. Patrick McManimon, McCarthy & Hicks, P. C., Princeton, N. J., Richard P. Brown, Jr., Gaylen J. Byker, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendants.

## OPINION AUTHORIZING WRIT OF ATTACHMENT

CLARKSON S. FISHER, Chief Judge.

### I. INTRODUCTION

This opinion authorizes the issuance of a writ of attachment directing the United States Marshal to seize certain property of the defendant Islamic Republic Iranian Air Force [hereinafter "I.R.I.A.F."], the successor of the Imperial Iranian Air Force ["I.I.A.F."], pending the resolution of plaintiff's suit against the defendants. The attachment is issued pursuant to the provisions of *Fed.R.Civ.P.* 64 and the New Jersey Attachment Statute, N.J.S.A. 2A:26–1 *et seq.*

The factual background of this action, including the identity of the parties and a review of the events leading up to this lawsuit, is set out in detail in my opinion denying the defendant's motion for the re-

lease of all restraints on its property and for a turnover order, filed July 24, 1979 [hereinafter referred to as "Opinion Maintaining Restraints"], and is not repeated here. The procedural history of this action is also set out in that opinion. Certain events have occurred subsequent to my denial of defendant's motions which must be set out.

After defendant's motions were denied on May 11, 1979, defendant applied to this Court for an order setting an amount to be deposited in a Trust Account established pursuant to an earlier court order [1], in lieu of posting a bond, and an order requiring the release of the property upon the deposit of that amount. *See* New Jersey Civil Practice Rule 4:60–13. A hearing was held and in an oral opinion delivered from the bench on May 22, 1979, transcript filed June 1, 1979, I granted defendant's motion, setting approximately $2,500,000 as the total amount to be either paid to Behring or deposited in the trust account.[2] Defendant reserved all rights with respect to the mo-

nies to be deposited to secure the release of its property.[3]

This occurred while the Order to Show Cause, with the accompanying Temporary Restraining Order, filed February 28, 1979, was still outstanding. The hearing on the Order to Show Cause was finally held on June 1, 1979 and I reserved decision on the numerous issues raised by the parties at that hearing. This opinion resolves these issues.

## II. THE PENDING APPLICATION

The Order to Show Cause and Temporary Restraining Order directed the defendants to appear and show "why an Order should not be entered authorizing the issuance of a Writ of Attachment directing the U.S. Marshal to seize certain [of defendant's property]". Although it has never been absolutely clear whether plaintiff intended to proceed under Rule 65 or Rule 64 of the *Fed.R. Civ.P.*, I deem the pending application to be one under *Fed.R.Civ.P.* 64. Rule 64 authorizes the use of the New Jersey Attachment Statute, N.J.S.A. 2A:26–1 *et seq.*[4]

1. On April 20, 1979 the parties, with the Court's approval, entered into a consent order entitled "Third Order Partially Releasing Restraints" ["Third Order"]. That order established a procedure whereby one planeload of equipment at a time would be released in exchange for a cash payment of $150,000.00. The cash payment was to be made directly to Behring to the extent that I.R.I.A.F. acknowledged its debts and any payment in excess of that amount was to be paid into a Trust Account to be established pursuant to that order. The order anticipated a later decision as to the total amount to be placed into the account, in exchange for the release of all restraints upon I.R.I.A.F. property. The I.R.I. A.F. consented to the order only upon the stipulation that it did so without prejudice to its rights with respect to the property. *See* Third Order, ¶ 2(c).

2. *See* Order, filed June 13, 1979.

3. If the application for a writ of attachment is denied the monies in the Trust Account must be returned to I.R.I.A.F. *See Jet Line Services, Inc. v. M/V Marsa El Hariga*, 462 F.Supp. 1165 (D.Md.1978).

4. Rule 64, *Fed.R.Civ.P.* provides:
 SEIZURE OF PERSON OR PROPERTY
 At the commencement of and during the course of an action, all remedies providing

for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought, subject to the following qualifications: (1) any existing statute of the United States governs to the extent to which it is applicable; (2) the action in which any of the foregoing remedies is used shall be commenced and prosecuted or, if removed from a state court, shall be prosecuted after removal, pursuant to these rules. The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.
 I apply Rule 64 because there is no substantial difference between Rule 64 and Rule 65 in the circumstances of this case. The only difference is that the bonding requirement of the New Jersey Attachment Statute incorporated by Rule 64 is discretionary with the court, *see* New Jersey Civil Practice Rule 4:60–5(d), while the bonding requirement of Rule 65 is mandatory. *See System Operations v. Scientific Games*, 555 F.2d 1131, 1145–46 (3d Cir. 1977).

New Jersey Civil Practice Rules 4:60–1 *et seq.* set out the procedure and basis upon which a writ of attachment may be issued. Rule 4:60–5(a) states that a writ may be issued by the court only if it finds, first, that "there is a probability that final judgment will be rendered in favor of plaintiff; second, that there are statutory grounds for the issuance of the writ; and third, that there is real or personal property of the defendant at a specific location within this state which is subject to attachment". I shall address each of these requirements in order.

### A. *The Probability that Final Judgment will be Rendered in Favor of Plaintiff.*

■ At the outset, the parties dispute the actual content of this requirement. Defendant contends that New Jersey Civil Practice Rule 4:60–5(a)(1) requires a showing that there is a reasonable probability that plaintiff will succeed on the merits, similar to the showing required for the issuance of a preliminary injunction under *Fed.R.Civ.P.* 65(a). *See, e. g., Doe v. Colautti,* 592 F.2d 704, 710–12 (3d Cir. 1979). Plaintiff, on the other hand, contends that the state cases require no more than a showing that plaintiff has a prima facie cause of action against the defendant. *See, e. g., Tanner Associates, Inc. v. Ciraldo,* 33 N.J. 51, 161 A.2d 725 (1960). I need not resolve this dispute because I believe that plaintiff has satisfied even the stricter showing which defendant would have me require.

The affidavits filed to date in this action show overwhelmingly that plaintiff is likely to succeed in this action. The Verified Complaint, and the Affidavit of Attachment of George Murphy, an employee and officer of Behring, filed together on February 28, 1979, aver the existence of the Behring–I.I.A.F. agreement and Behring's performance under it at all relevant times prior to January 1979. Verified Complaint, *supra,* Exhibit B. Mr. Murphy further swears that defendant breached the contract both by failing to approve invoices for goods shipped to Iran and by failing to send planes to pick up cargo ready for shipment.

Although reference to the contract shows that there is in fact a question as to whether the failure to send planes constitutes a breach, the failure to approve invoices properly submitted would constitute a breach of that agreement. I.R.I.A.F. has proffered no evidence which contradicts the averments in Mr. Murphy's affidavit.

The I.R.I.A.F., however, raises two affirmative defenses which are alleged to excuse its non-performance under the contract: force majeure and the Act of State Doctrine. *See* Answer and Counterclaim, filed May 18, 1979, First, Second, Third, and Fourth Affirmative Defenses. Before turning to the merits of these affirmative defenses, I note that I find it difficult to believe that defendant seriously presses them. I.R.I.A.F.'s Memorandum of Law In Response To Order To Show Cause Why A Writ of Attachment Should Not Issue [hereinafter "I.R.I.A.F.'s Responsive Memorandum"] presents its conclusory allegations with regard to these defenses in two paragraphs without citing a single authority. Furthermore, I.R.I.A.F. does not support these allegations with any evidence. Even if I were to conclude that these doctrines were generally applicable, I would therefore have no factual basis for finding that I.R.I.A.F.'s non-performance was excused. Defendant's failure to supply evidence does not hurt it, however, because I do not believe that the defenses are applicable here.

### 1. *Act of State.*

■ The traditional formulation of the Act of State doctrine is set out in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), where the Supreme Court stated:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers between themselves.

See *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 691 n. 7, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). The doctrine, however, distinguishes between the public and governmental acts of sovereign states and their private and commercial acts. The doctrine does not preclude me from considering the "repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities". *Alfred Dunhill of London, Inc., supra*, 425 U.S. at 695, 96 S.Ct. at 1861. Even when applicable the doctrine only serves to preclude certain issues from consideration by the court; it does not render an entire case or controversy non-justiciable. *See National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 640 (S.D.N.Y. 1978).

■ As is indicated by my Opinion Maintaining Restraints, all parties to this action have proceeded upon the assumption that I.R.I.A.F.'s activities in this country were commercial in nature. This Court so held in determining that subject matter jurisdiction over this controversy existed by virtue of 28 U.S.C. § 1330(a). *See* Opinion Maintaining Restraints, supra at 402–403 (D.C.). Finally, it can be argued that the breaches of contract committed by I.R.I.A.F. occurred *in this country,* when the I.R.I.A.F. representative in New York City refused to approve invoices for payment.[5]

I therefore conclude that the Act of State doctrine in no way diminishes the probability that Behring will succeed in this, litigation.

### 2. *Force Majeure.*

■ The traditional formulation of the doctrine of force majeure (Vis Major) may be found in *Blacks Law Dictionary* (Rev'd 4th ed. 1968):

A greater or superior force; an irresistible force. A loss that results immediately from a natural cause without the intervention of man, and could not have been prevented by the exercise of prudence, diligence, and care. A natural and inevitable necessity, and one arising wholly above the control of human agencies, and which occurs independently of human action or neglect. In the civil law, this term is sometimes used as synonymous with *"vis divina"*, or act of God. (Citations omitted.)

There is no doubt that what occurred here was within the control of human agencies. Although keeping in mind that defendant has submitted absolutely no proof as to the cause of its breach, I.R.I.A.F.'s Responsive Memorandum, *supra*, at 4, claims that the causes of the alleged breach were "political turmoil and violent revolutionary struggles in Iran, a breakdown in the military chain of command, lack of fuel, airfields closed, by strikes and/or government decrees, and denial of over-flight permission by third countries". Even if proved, such circumstances would not excuse I.R.I.A.F.'s breach on the grounds of *force majeure.*

I conclude that there is a probability that Behring will succeed on the merits of this case, N.J. Civil Practice Rule 4:60–5(a)(1), and now turn to the statutory authority for the issuance of a writ of attachment.

### B. *Statutory Basis for the Writ.*

The second requirement set out in New Jersey Civil Practice Rule 4:60–5(a) for the issuance of a writ of attachment is that there exist a statutory basis for the issuance of the writ. The New Jersey Attachment Statute, N.J.S.A. 2A:26–1 *et seq.,* is the sole source of authority for a writ of attachment in New Jersey. *E. g. Tanner Associates, Inc. v. Ciraldo,* 33 N.J. 51, 161 A.2d 725 (1960). That statute allows a writ to issue in five situations, two of which

---

5. In addition to the fact that the refusal to honor invoices occurred in New York City, there is no indication that the refusal was ordered from or approved by Teheran. Considering the political state of Iran, it would appear possible that the refusal was the result of the I.R.I.A.F. representative's fear to take any action which could cause trouble for him with Iran's new government. Putting aside such speculation, I.R.I.A.F. has failed to introduce any proof tending to show that the refusal was "invested with sovereign authority" from Iran. *National American Corp., supra,* 448 F.Supp. at 639–41.

Behring contends apply here. In pertinent part, N.J.S.A. 2A:26–2 provides:

### ISSUANCE OF ATTACHMENTS; GROUNDS

An attachment may issue out of the superior court, any county court or county district court upon the application of any resident or nonresident plaintiff against the property, real and personal, of any defendant in any of the following instances:

a. *Where the facts would entitle plaintiff to an order of arrest before judgment in a civil action* ; and in such cases the attachment may issue against the property of a female, or of a corporation in the same manner as though the defendant would be liable to arrest in a civil action, except that, in actions founded upon a tort, an attachment shall not issue against a corporation upon which a summons can be served in this state; or

b. *Where the defendant absconds or is a nonresident of this state, and a summons cannot be served on him in this state* ; but an attachment shall not issue hereunder against the rolling stock of a common carrier of another state or against the goods of a nonresident in transit in the custody of a common carrier of this or another state . . .

\* \* \* \* \* \*

For the purposes of this section a summons can be served upon a person in this state where service can duly be made upon someone on his behalf in the state, but not where service may be made only by publication in the state. (Emphasis added.)

### 1. *N.J.S.A. 2A:26–2(a).*

■ Behring first argues that a writ of attachment is available because it would be entitled to an order of arrest before judgment in a civil action. N.J.S.A. 2A:26–2(a). The availability of such an arrest order is governed by the Capias Act, N.J.S.A. 2A:15–40 *et seq.* In relevant part, the Capias Act provides:

A capias ad respondendum shall issue in an action founded upon contract, express or implied, due to plaintiff from defendant, only when the proof establishes the particulars specified in one or more of the following subparagraphs:

a. That defendant is about to remove any of his property out of the jurisdiction of the court in which the action is about to be commenced or is then pending with intent to defraud his creditors; . . . . .

N.J.S.A. 2A:15–42(a).

Behring contends that it could obtain an order of arrest of I.R.I.A.F., if it were an individual, under the circumstances of this case. I disagree.

There is no doubt that the defendant will remove its property out of the jurisdiction of this Court should I deny plaintiff's application. A cursory reading of the statute, however, reveals that this alone will not support a writ. The quoted language explicitly requires that the removal of property be done with the intent to defraud creditors. *Cf. H. B. Claflin & Co. v. Deterbach,* 28 A. 715 (N.J.1893) (applying a predecessor statute of N.J.S.A. 2A:15–42(a)).

The most that can be inferred from the present record is that during the regular course of defendant's dealings with plaintiff, I.R.I.A.F. will have its property shipped out of the jurisdiction of this Court, and that plaintiff fears that the political upheaval in Iran will prevent any more of defendant's property from coming into this Court's jurisdiction, thus preventing plaintiff from satisfying its judgment within this district. Nowhere in the Verified Complaint are defendant's acts alleged to be done with intent to defraud plaintiff. Likewise, none of the affidavits filed by plaintiff aver that I.R.I.A.F. intends to defraud Behring.

I am therefore satisfied that the record before me does not allow of an attachment issued pursuant to N.J.S.A. 2A:26–2(a) and 2A:15–42.

### 2. *N.J.S.A. 2A:26–2(b).*

■ An order of attachment is issuable under N.J.S.A. 2A:26–2(b) when two re-

quirements are satisfied. The first requirement is that the defendant must either abscond from or be a nonresident of this state. There is little doubt that I.R.I.A.F. is not a resident of New Jersey. I.R.I.A.F. is an agency or instrumentality of a foreign state, Iran. 28 U.S.C. § 1603. It is not created under the laws of this state. It has not obtained a certificate of authority to do business here. It maintains no offices here. Its sole presence in this state consists of the occasional visits of I.R.I.A.F. cargo planes to McGuire Air Force Base to pick up shipments of goods, and the occasional visits of I.R.I.A.F. employees to Behring's Edison, New Jersey, warehouse to inspect its purchases. These contacts with this state fall short of making New Jersey I.R.I.A.F.'s residence as that term is used in the statute. *See Baldwin v. Flagg*, 43 N.J.L. 495 (Sup.Ct.1881); *Augustus Co. v. Manzella*, 19 N.J.Misc. 29, 17 A.2d 68 (Atlantic Co.Ct. 1940). I therefore find that the first requirement set out in N.J.S.A. 2A:26–2(b) satisfied.

The second requirement of the statute is that the defendant must not be subject to service of process in this state. The statute, in clarification of this requirement, states that "a summons can be served on a person in this state where service can duly be made upon some one on his behalf in the state. . . ." N.J.S.A. 2A:26–2. I.R.I. A.F. argues that its representative in this country, Colonel Khatami, could have been duly served with a summons on its behalf in this state pursuant to 28 U.S.C. § 1608(b)(2).[6] Behring claims that he could not.

■ Resolution of the conflict demands that I first determine when it was that service could have been made upon defendant in this state. The state cases indicate that the presence or absence of this requirement is to be determined at the time the

writ is to be issued. *E. g. Baldwin, supra*, 43 N.J.L. at 498; *Augustus Co., supra*, 19 N.J.Misc. at 31, 17 A.2d 68. Technically, any writ of attachment authorized by this opinion should look to whether the defendant—or someone who could be served on its behalf—was subject to service of summons within this state on the hearing date of June 1, 1979.

Plaintiff, however, argues that the Court should look to February 28, 1979, when it first sought the writ of attachment and when the Temporary Restraining Order in the nature of an attachment was issued. I agree. For the purposes of this element, I believe it proper to act as if the Court issued a writ of attachment on February 28, 1979 and treat the present opinion as if addressing a motion to dissolve the attachment brought pursuant to New Jersey Civil Practice Rule 4:60–11. *Cf. Sampson v. Murray*, 415 U.S. 61, 86–87 & n. 58, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (regarding the propriety of treating a temporary restraining order as a preliminary injunction under *Fed.R.Civ.P.* 65). This accords with the express statutory directive that the Attachment Statute "be liberally construed, as a remedial law for the protection of resident and nonresident creditors and claimants". N.J.S.A. 2A:26–1. *E. g. United States Steel Corporation v. Commercial Contracting Corp.*, 168 F.Supp. 375 (D.N.J.1958); *Mueller v. Seaboard Commercial Corp.*, 5 N.J. 28, 39, 73 A.2d 905 (1950).

■ On February 28, 1979 Colonel Khatami was not present in this state for the purpose of accepting service of process on behalf of the defendant I.R.I.A.F.[7] Even if he had been in the state on that date, I would hold that he was not one upon whom service could duly be made on I.I.A.F. or I.R.I.A.F.'s behalf pursuant to 28 U.S.C. § 1608(b)(2). At that time, events in Iran

**6.** 28 U.S.C. § 1608(b)(2) reads in relevant part:
 (b) Service in the courts of the United States shall be made upon an agency or instrumentality of a foreign state:
 * * * * * *
 (2) . . . by delivery of a copy of the summons and complaint either to an officer,

a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States . . . .

**7.** *See* Affidavit of Notice of Robert W. Delvanthal, Esq., filed March 5, 1979.

were such that Behring could not be certain of Khatami's status with the defendant. In fact, the defendant with which Colonel Khatami was then affiliated, the I.I.A.F., is now apparently defunct and only its successor I.R.I.A.F. has appeared. It is not apparent from the record when or how Colonel Khatami became a representative of the successor organization. I therefore conclude that Khatami was not someone on whom service could have been made on behalf of I.R.I.A.F.[8] I therefore conclude that the second requirement of N.J.S.A. 2A:26-2(b) is met.

I cannot yet conclude, however, that the statutory grounds for the issuance of a writ of attachment are completely satisfied. I.R.I.A.F. contends that N.J.S.A. 2A:26-2(b) provides for attachment only as an aid to jurisdiction, and that it is not available when jurisdiction *in personam* may be obtained over the defendants. I.R.I.A.F., however, cites no cases in direct support of this proposition.

▮ The New Jersey Attachment Statute has been in substantially the same form for over a century. *See Hotel Registry Corp. v. Stafford*, 70 N.J.L. 528, 57 A. 145 (Sup.Ct. 1904). As a result, most of the cases interpreting the attachment act and its predecessors involve jurisdictional attachments prior to the widespread enactment of "long arm" statutes occasioned by *International Shoe Corp. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). I am satisfied, however, that a writ of attachment is authorized by the New Jersey statute under the circumstances of this case even though plaintiff has obtained *in personam* jurisdiction of the defendant I.R.I.A.F.

The statute itself requires no more than an inability to serve a defendant within the state; it does not require that personal jurisdiction over the defendant not be obtainable. In fact, even the older cases us-

ing attachment as a jurisdictional device recognized that a diligent plaintiff-creditor could often obtain personal jurisdiction over a defendant by waiting until he entered the state, yet nonetheless allowed the writ to issue. *See, e. g., Baldwin, supra*, 43 N.J.L. at 498 (wherein the court states: "[A debtor] may come into the state so frequently and openly, that a creditor by watching an opportunity may obtain personal service of process upon him, and still be liable to process of attachment."). It is obvious to the Court that one of the major, accepted purposes of attachment is to protect a prospective fund from which plaintiff could satisfy a judgment to be rendered in the future in an action on a contract from being dissipated. *See Lundy v. Collitti*, 155 N.J.Super. 34, 38, 382 A.2d 94 (L.Div.1977); *Prozel & Steigman v. International Fruit Distributors*, 171 F.Supp. 196, 199 (D.N.J.1959). That purpose recognizes that debtors having little contact with this state, even though those contacts may be more than minimal, will suffer little by withdrawing altogether from this state in an effort to frustrate the judgment won by the creditor. Additionally, it is clear that under other sections of the Attachment Statute, a writ of attachment is authorized even though the debtor is within the state and subject to personal jurisdiction. *E. g. Seiden v. Fishstein*, 44 N.J.Super. 370, 376, 130 A.2d 645 (App.Div.1957) (allowing the attachment of the property of a resident debtor under N.J.S.A. 2A:26-2(a)).

I therefore conclude that there exists a statutory basis for the issuance of a writ of attachment in N.J.S.A. 2A:26-2(b) and that the second element of New Jersey Civil Practice Rule 4:60-5(a) is present.

C. *The Presence of Property in this State Subject to Attachment.*

I turn now to the final requirement of New Jersey Civil Practice Rule 4:60-5(a):

---

**8.** In addition to service upon the defendant I.I.A.F. through diplomatic channels, service was in fact attempted upon I.I.A.F. by service upon Colonel Khatami pursuant to 28 U.S.C. § 1608(b)(2). *See* Opinion Maintaining Restraints, *supra*, at 387 n. 8. Although the question of the sufficiency of service upon Kha-

tami as service upon I.R.I.A.F. has risen in the context of the instant attachment problem, I must keep in mind whether I would have been willing to enter a default judgment against I.R.I.A.F. solely on the basis of service upon Khatami had the I.R.I.A.F. not appeared in this matter.

"that there is real or personal property of the defendant at a specific location within [New Jersey] subject to attachment." The defendant's personal property located at plaintiff's Edison, New Jersey warehouse satisfies this requirement in all but possibly one respect. Defendant argues that its property enjoys immunity from attachment under the Foreign Sovereign Immunities Act of 1976, Pub.L.No. 94–583, 90 Stat. 2891 (codified in scattered sections of 28 U.S.C.) [hereinafter "Immunities Act" or "Act"] because it is intended for use in connection with a military activity. 28 U.S.C. § 1611(b)(2). *See also Aerotrade Inc. v. Republic of Haiti*, 376 F.Supp. 1281 (S.D.N. Y.1974).

 My Opinion Maintaining Restraints resolved two central questions. I first held that I.R.I.A.F. property was *not* subject to attachment prior to judgment under the Immunities Act, sections 1609, 1610(b) and (d). However, I then held that Iran had waived its immunity from such attachments in the Treaty of Amity, Economic Relations and Consular Rights Between the United States of America and Iran, August 15, 1955, art. XI, para. 4 [1957] 8 U.S.T. 899; T.I.A.S. No. 3583 [hereinafter "Treaty of Amity" or "Treaty"], and that that waiver had to be given effect under section 1609 of the Immunities Act. Although I.R.I.A.F. raised its contentions with respect to section 1611(b) of the Act, I refrained from deciding that issue because the record was barren of any facts supporting its claim. In spite of the continued barrenness of the record, which again causes me to conclude that I.R.I.A.F. has not carried its burden of showing that its property is immune,[9] I will address this argument in more detail at this time.[10]

As it was the starting point for discussion in my prior opinion, the starting point for this discussion is the Immunities Act. *See* Opinion Maintaining Restraints, *supra*, at 13 & n. 21. Section 1609 of the Act sets out as a general rule that the property, of whatever nature, of a foreign state is immune from attachment.[11] Exceptions to this general rule are found within the Act in section 1610, and without the Act in certain international agreements which section 1609 explicitly saves from repeal. The exceptions established in section 1610 are based upon the activities in which a foreign state engages, and not upon the type of property involved. The exceptions established without the Act by international agreement do not follow any general rule, but are a product of the negotiations between the United States and foreign states, differing from one agreement to the next. Section 1611 provides that certain types of property will be immune from execution regardless of prior waivers.

 At issue here is section 1611(b)(2) which provides immunity for certain types of military equipment. Although section 1611(b)(2) does restore the immunity, otherwise waived in section 1610, of military equipment, I must reject I.R.I.A.F.'s contention that section 1611(b)(2) restores the immunity of military equipment when that immunity has been waived by an interna-

---

9. I.R.I.A.F. has the burden of proving a defense of sovereign immunity. H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 17 *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6616 [hereinafter H.R.Rep. No. 94–1487]. *See* Opinion Maintaining Restraints, *supra*, at 389 n. 16.

10. I am aware that, based upon my summary opinion, filed May 11, 1979, the parties entertained the misconception that I have already ruled upon this question, holding that section 1611 is inapplicable to this case. *See* Plaintiff's Letter Memorandum of Law in Response to Order to Show Cause Why a Writ of Attachment Should Not Issue, at 2–3. My failure to address this issue in that summary opinion was not meant to be taken as an implied ruling on the issue. This misconception has since been clarified. *See* Opinion Maintaining Restraints, *supra*, at 395 n. 30.

11. 28 U.S.C. § 1609 provides:

Subject to existing international agreements to which the United States is a party at the time of the enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest or execution except as provided in sections 1610 and 1611 of this chapter.

tional agreement saved by section 1609.[12] The prefatory language of section 1611(b) states only that "[n]otwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment" if certain conditions are met. This language states that the subsection operates notwithstanding the provisions of only section 1610; section 1609 is not mentioned. A central premise of my Opinion Maintaining Restraints was that section 1609 saved from repeal any existing international agreement to which the United States was a party at the time the Act was enacted.[13] Section 1611(b), by referring only to section 1610, cannot be read to abrogate existing treaties saved from repeal by section 1609 to the extent that military equipment might be involved.

The Treaty of Amity is therefore the next point of departure. My first concern must be whether the Treaty addresses the problem of military equipment. If the Treaty expresses a rule which conflicts with the Immunities Act, I must give effect to that rule, whatever it may be. If the Treaty is silent on that issue, however, then the provisions of the Immunities Act will, in accord with Congress' intent, govern the outcome of this case.[14] My first task is therefore to determine whether the Treaty is silent on the issue of military property.

The grants and waivers of immunity provided by the Immunities Act are based upon four variable factors: the nature of the foreign entity, the nature of the activity in which the foreign entity is engaged, the nature of the liability sought to be enforced against that foreign entity, and the nature of the property of the foreign entity sought to be attached. In enacting the Act, Congress clearly considered each of these four categories and expressed its intentions with regard to each of them.

Keeping these four categories in mind while examining the pertinent provisions of the Treaty of Amity, I must conclude that in negotiating and ratifying the Treaty, the United States and Iran only expressed their intentions as to the first three of these variables; the Treaty is silent as to the fourth. The relevant portion of the Treaty is article XI, paragraph 4, which provides:

No *enterprise* of either High Contracting Party [referring to the United States of America and Iran], *including corporations, associations, and government agencies and instrumentalities*, which is publicly owned or controlled shall, if it engages in *commercial, industrial, shipping or other business activities* within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein *from taxation, suit, execution of judgment, or other liability to which privately owned and controlled enterprises are subject therein.* (Emphasis added.)

[1957] 8 U.S.T. at 901. Behring argues that this Court's prior interpretation of this language, that the parties desired to be treated as private ordinary citizens, necessitates a conclusion that any and all property of the defendant must be subject to attachment. I disagree.

My decision that the United States and Iran desired to be treated as ordinary individuals in the other's courts operates only with regard to the liabilities to which they

12. I.R.I.A.F. argues that section 1611(b) applied "notwithstanding any of the [Immunities Act's] exceptions to the immunity of the property of a foreign state". See I.R.I.A.F. Responsive Memorandum at 2. As the text reveals, I believe that section 1611 applies notwithstanding only the exception to immunity set out within the act in section 1610. Section 1611 standing alone has no effect on those exceptions from without the Act by virtue of the savings clause of section 1609.

13. See Opinion Maintaining Restraints, *supra*, at 393 & n. 27.

14. My Opinion Maintaining Restraints discusses the legislative history of the Immunities Act. That history shows quite clearly that Congress intended the Immunities Act to govern notwithstanding the savings clause of sections 1604 and 1609 whenever an international agreement was silent upon an issue which the Act addresses. See H.R.Rep. No. 94–1487, *supra*, at 13, 17–18, 26; [1976] U.S.Code Cong. & Admin. News at 6611, 6616, 6625. See also Opinion Maintaining Restraints, *supra*, at 393 & n. 27.

would be subject. In the Treaty, the parties waived immunity "from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject". In my Opinion Maintaining Restraints, *supra,* at 395, I accepted Behring's argument that the "or other liability" language which the parties employed indicated that the specific language preceding it was language of illustration and not of limitation. I therefore concluded that the United States and Iran expressed their intention that the waiver be read broadly to include pre-judgment attachments. This phrase, however, deals only with one of the four variables which Congress addressed in the Immunities Act—the liabilities to which the parties would be subject.

The Treaty uses similarly broad language with respect to two other variables: the nature of the foreign entity and the nature of the activity in which that entity is engaged. With respect to the former, the waiver of immunity is effective for all "enterprises" of the United States and Iran, "including corporations, associations, and government agencies and instrumentalities". The list indicates that the parties considered the proper scope of the waiver with regard to the variable and stated a position on it. With respect to the latter variable, the waiver of immunity is effective whenever the foreign entity engages in "commercial, industrial, shipping or other business activities". Again I must conclude that the parties considered the proper scope of the waiver with respect to this variable and stated a position on it. In each case illustrative lists or catch-all "or other . . ." language is used to indicate the desired breadth of the waiver.

The Treaty, however, does not use such language with respect to the variable presently at issue: the nature of the property. It states only that the foreign entity shall not enjoy immunity "for itself or its property". The ". . . or its property" language is almost an afterthought. No illustrative list precedes the word property. No catch-all "or other property" or "of whatever kind" language is used. It is not obvious that the United States and Iran considered the question of differentiating between types of property, and I therefore cannot conclude that they stated, or intended to state, a position on this issue.

 I must therefore conclude that the Treaty is silent with respect to whether certain types of property are subject to attachment. This being the case, the legislative history, *see* note 14, *supra,* makes perfectly clear that I must look to the Immunities Act, in this case section 1611, to determine whether certain types of property are immune from attachment. Section 1611(b)(2) states:

> (b) . . . the property of a foreign state shall be immune from attachment and from execution, if—
>
> \* \* \* \* \* \*
>
> (2) the property is, or is intended to be, used in connection with a military activity *and*
>
> (A) is of a military character, *or*
>
> (B) is under the control of a military authority or defense agency.

I.R.I.A.F. has not shown that either of these exceptions apply. There is no proof in the record of this case regarding whether the property sought to be attached is of a military character. It is therefore not immune from attachment under section 1611(b)(2)(A). Likewise, there is no evidence contradicting the allegations of Behring's Verified Complaint and supporting affidavits that the property is in the control of Behring, which is neither a military authority nor a defense agency.[15] The property therefore is not immune from attachment under section 1611(b)(2)(B). The only proof submitted by the defendant which addresses this issue is the Affidavit of Colonel Khatami, filed May 4, 1979 at ¶ 2, to the effect that the materials were purchased

---

15. *See* Verified Complaint, *supra,* ¶ 11; Affidavit of Attachment of George A. Murphy, *supra,* ¶ 12.

for use in connection with I.R.I.A.F. military activities.[16] At most, I.R.I.A.F. has raised an issue of fact with respect to only this last element.

I must conclude that I.R.I.A.F. has not sustained its burden of showing immunity from attachment. There is, therefore, property in this state subject to attachment and the third requisite of New Jersey Civil Practice Rule 4:60–5(a) is satisfied.

Accordingly, I must conclude that plaintiff has established that it is entitled to a writ of attachment in this matter, and I will enter an order authorizing the issuance of such a writ.

## III. BOND

 The defendant has requested that plaintiff be required to post a bond sufficient to cover any damages caused to it by the writ of attachment should plaintiff fail in this action, or should it eventually be determined that it was not entitled to this writ of attachment. Under *Fed.R.Civ.P.* 64, and New Jersey Civil Practice Rule 4:60–5(d), a bond requirement is entirely within the discretion of the court. Because of the unusual nature of this case and the unusual circumstances in which the defendants find themselves, I will require the plaintiff to post a bond. I have reviewed the defendant's answer and counterclaim in this matter, and, in light of the fact that defendant has been able to have the use of its property by the deposit of monies to a Trust Account, *see supra* note 1, I believe that a bond in the amount of $20,000.00 will adequately protect the defendant.

Plaintiff shall submit an order in accord with this opinion.

---

**16.** Affidavit of Colonel Khatami, filed May 4, 1979, at ¶ 2, *states:*

　　2. All of the [goods covered by the Behring Contract] purchased by the [I.R.I.A.F.] or its predecessor [I.I.A.F.] in the United States have been purchased for use by [I.R.I.A.F.] in connection with military activities and not for resale or any non-military use.