**BAGLAB LIMITED, Strongsay Limited and Parklane Investments, Inc. Plaintiffs,**

v.

**JOHNSON MATTHEY BANKERS LIMITED and the Bank of England, Defendants.**

No. 85 Civ. 8993 (RJW).

United States District Court, S.D. New York.

July 24, 1987.

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, for plaintiffs; Arthur H. Ruegger, of counsel.

Sullivan & Cromwell, New York City for defendants; William E. Willis, Robinson B. Lacy, Deborah C. Moritz, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs Baglab Limited ("Baglab"), Strongsay Limited ("Strongsay"), and Parklane Investments, Inc. ("Parklane") have sued Johnson Matthey Bankers Limited ("JMB") and the Bank of England (the "Bank"), asserting a number of causes of action stemming from defendants' allegedly wrongful refusal to honor an agreement to provide financing. The Bank has moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. For the reasons to follow, the Court grants the Bank's motion to dismiss the complaint.

## BACKGROUND

A. Parties.

Baglab, Strongsay, and Parklane are corporations organized under the laws of

Rhode Island, the Island of Jersey, and Texas respectively. Baglab is authorized to do business in New York and maintains its principal place of business in New York City. Strongsay, now defunct, had its principal place of business in Providence, Rhode Island. Parklane owns a warehouse located in East Providence, Rhode Island.

The Bank of England is an English Crown Corporation wholly owned by the Government of the United Kingdom. The Bank is the central bank of the United Kingdom. In that capacity, it is authorized to issue currency, to manage the nation's gold and foreign exchange reserves, and to regulate deposit-taking institutions in the United Kingdom. The Bank is an agency or instrumentality of a foreign state within the meaning of section 4(a) of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603(a).

Defendant Johnson Matthey Bankers Limited ("JMB") is a banking corporation organized under the laws of England. JMB's principal place of business is London. Prior to October 1, 1984, when its ownership and control were transferred to the Bank of England, JMB was a wholly-owned subsidiary of Johnson Matthey Public Limited Company ("JM–PLC"), an English holding company.

B. Events.

In deciding this motion, the Court accepts plaintiffs' well-pleaded allegations as true. In 1983, JM–PLC determined to sell Johnson Matthey Jewelry Corporation ("JMJC"), a financially troubled and insolvent jewelry and luggage business it owned and operated in the United States. In an effort to sell JMJC, an officer of JMB contacted Mr. Shamji, a long-time customer of JMB to determine whether he might be interested in purchasing the business. Shamji referred JMB to a relative, Mr. Walji. Walji, allegedly upon the urging and encouragement of JMB and in reliance upon JMB's offer to finance the purchase, agreed to purchase the two businesses and a warehouse in Providence, Rhode Island.

Shamji's companies, the Gomba Group, entered into letter agreements to purchase JMJC in contemplation of transferring the businesses to plaintiffs. The letter agreements specified the purchase price for the businesses and set out a schedule of payments to be made to JMJC.

In January of 1984, Walji took possession of the jewelry and luggage operations even though the parties had not yet closed the transaction. New York counsel for JMB and JMJC prepared the closing documents. Plaintiffs contend that they allowed JMB and JMJC to dictate the terms of the agreement on the basis of their representations as to the bright prospects for their future business association. The terms, which plaintiffs now contend are unfair, included provisions that JMB could withdraw financing without cause, that plaintiffs would pay counsel fees, and that plaintiffs would have to pay whatever fees and expenses JMB would incur in connection with the agreement.

By plaintiffs' account, the jewelry and luggage operations improved steadily through 1984. JMB, however, did not fare so well. During 1984, the grave problems which had surfaced in JMB's loan portfolio threatened its solvency. To avoid serious disruption of the gold bullion market in England, the Bank of England acquired JMB from JMB–PLC on October 1, 1984 for the nominal sum of one dollar. As part of that agreement, JMB–PLC contributed fifty million pounds toward JMB's losses. At the time it acquired JMB, the Bank of England announced its intention to return the bank to the private sector. JMB is now Minories Finance Limited.

After October 1, 1984, Stephen Grady handled JMB's business dealings with plaintiffs. Plaintiffs assert that Grady originally assured them that JMB still intended to provide the funds and that the anticipated financing would encounter no problems. At a meeting on December 10, 1984 in Providence, Rhode Island, however, JMB raised, assertedly for the first time, certain unresolved items including an inventory of the jewelry stock. Plaintiffs agreed to allow an independent firm to audit and appraise the inventory. Up until this point, plaintiffs aver, JMB had not

openly repudiated its stated intention to follow through with the financing on December 30, 1984. JMB, however, delayed payment of the funds past the anticipated closing date. JMJC then served a default notice on plaintiffs, but when plaintiffs explained that JMB had assured them that the money would be forthcoming, JMJC withheld legal proceedings. When the payment remained outstanding in February, JMJC commenced an action to attach the assets of the business and to restrain plaintiffs from further dealing with the business. Johnson Matthey Florida, JMJC's assignee, is now disposing of the assets of the jewelry business.

After losing the jewelry business, plaintiffs turned to Baglab, which was also dependent upon JMJB for financing. On March 22, 1985, Walji sent a financial statement to Grady in anticipation of receiving funding on the scheduled closing date of June 30, 1985. Plaintiffs contend that Grady simply requested further information. Grady subsequently met with Walji in Baglab's offices in New York City. At that meeting on May 22, 1985, Grady supposedly stated that JMB saw its role as an English bank whose proper role involved English rather than international financing and informed plaintiffs that in light of Baglab's earlier default on its agreement with JMB, JMB considered itself relieved of its obligation to proceed with the June 30 financing.

When the June 30 financing date passed without any action by JMB, Johnson Matthey Florida threatened to foreclose on the luggage operation. Plaintiffs turned over the assets of the luggage operation to Johnson Matthey Florida.

Plaintiffs then instituted the present action against JMB and against the Bank of England who, plaintiffs aver, directed and controlled the actions of JMB after October 1, 1984. Plaintiffs seek a declaration that defendants wrongfully breached their financing agreement and request injunctive and monetary relief for the destruction of their businesses. The Bank of England asserted the defense of sovereign immunity and moved to dismiss the complaint under Rule 12(b)(1), Fed.R.Civ.P., for lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, under Rule 12(b)(6), Fed.R. Civ.P., for failure to state a claim upon which relief may be granted, and under Rule 11, Fed.R.Civ.P., for attorneys' fees and sanctions. JMB moved for summary judgment under Rule 56, Fed.R.Civ.P. In order to consider deposition testimony submitted by the parties, the Court, upon notice to the parties, converted the Bank's motion to dismiss the complaint for failure to state a claim upon which relief could be granted into one for summary judgment under Rule 56, Fed.R.Civ.P. The Court scheduled a conference and heard oral argument on all motions October 10, 1986.

At oral argument, counsel for the Bank of England pragmatically conceded that while the acquisition of JMB itself was a sovereign act, JMB was clearly engaged in commercial activity and that should JMB's conduct be deemed to be that of the Bank of England, the motion to dismiss the complaint on grounds of sovereign immunity should be denied. Nevertheless, although numerous Bank personnel had been seconded to JMB, the Bank maintained that once it had replaced and restructured JMB management, it had not exercised day-to-day management over JMB but rather the two institutions had operated as separate entities under independent management.[1] For their part, plaintiffs asserted that the Bank exercised sufficient direction and control over JMB to incur liability under the commercial activity exception to the FSIA. Plaintiffs argued alternatively that they

---

**1.** As counsel explained, secondment of staff is a regular practice in London. The secondee remains on the payroll of the seconding employer, but is subject to the rules and requirements of the organization to which he or she is seconded. The employees seconded to JMB worked for it on a full-time basis and owed their exclusive loyalty to JMB. They took their instructions from the officers and directors of JMB, not from their seconding employer. All secondees at JMB, including those from the Bank of England, signed an undertaking not to discuss the business of JMB or any of its customers with anyone other than the officers and directors of JMB.

should be permitted discovery on the issue of the degree of control the Bank actually exercised over JMB.

Because the intent of the parties formed a factual issue concerning liability under the financing agreement, the Court denied both motions for summary judgment. Inasmuch as the degree of control actually exercised by the Bank of England over JMB also presented a factual issue, the Court denied without prejudice the Bank's motion to dismiss the complaint. The Court directed the parties to conduct limited discovery from JMB, and from Bank of England personnel who had been seconded to JMB, concerning the role the Bank of England had played in JMB's business activities after acquiring the bank.

In response to plaintiffs' discovery requests, JMB produced (1) a list of all individuals whom the Bank of England had brought in to assist JMB after October 1, 1984, and (2) all documents concerning any communication between or among those individuals, JMB, and the Bank of England relating to the plaintiffs or to any category of JMB customers of which the plaintiffs would be a part. Portions of certain documents were redacted. Plaintiffs' counsel reserved the right to apply to the Court to review the redacted documents *in camera*, to order document production from the Bank of England or to order further discovery. On October 31, 1986, the parties took the deposition of Martin J. Harper, the loan officer at JMB who had recommended to the JMB executive committee that the bank not advance additional funds to plaintiffs.

On the basis of the discovery and Harper's deposition, the Bank of England renewed its motion to dismiss the complaint for lack of subject matter jurisdiction. The Court held oral argument on the renewed motion on January 30, 1987. On the basis of that argument and particularly Harper's deposition testimony, the Court suggested that plaintiffs voluntarily dismiss the complaint as against the Bank of England without prejudice to a motion to vacate the judgment should discovery uncover evidence that the Bank of England had specifically directed JMB personnel to repudiate the financing agreement with plaintiffs. Defendants' counsel agreed that should plaintiffs consent to dismiss the Bank of England, the Bank would not challenge as irrelevant proper discovery requests directed (1) to learning the direct involvement, if any, of the Bank of England in the decision not to proceed on the loan to plaintiffs or (2) to ascertaining the degree of direct control the Bank of England exercised over JMB. Counsel also agreed to make Mr. Rodney Galpin, an executive director of the Bank of England who had been appointed Chairman of JMB, available for deposition.

After presenting the Court's suggestions to his clients, plaintiffs' counsel informed the Court in April that plaintiffs could not agree to dismiss the Bank of England voluntarily. On July 22, 1987, The Court held a status conference with the parties. Neither party had conducted any additional discovery. Inasmuch as the parties energetically dispute the significance of the discovery taken so far and pointedly disagree about the need to conduct further discovery on the issue, the Court must determine whether subject matter jurisdiction exists over plaintiffs' claims against the Bank of England. To do so, the Court must decide the narrow issue of whether plaintiffs have sufficiently supported their contentions that Bank of England personnel directed the decision not to loan funds to plaintiff and that the supervisory activities of the Bank of England with respect to JMB warrant looking beyond their separate juridical status to hold the Bank liable for the concededly commercial activities of JMB.

## DISCUSSION

■ The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611, immunizes foreign states, their agencies, and instrumentalities except as otherwise provided in the Act.[2] When a plaintiff alleges that the complaint arises out of purely commercial

---

2. Whenever the foreign state or entity enjoys no immunity, the federal courts have jurisdiction to hear the controversy under 28 U.S.C. § 1330(a).

acts, the defendant must establish a *prima facie* case that it is a sovereign state or an instrumentality of a sovereign state. This proof establishes a presumption that immunity applies. Plaintiff then has the burden of going forward with evidence that the FSIA does not apply. Once plaintiff has done this, defendant must prove its entitlement and that none of the exceptions apply by a preponderance of the evidence. *Meadows v. Dominican Republic*, 817 F.2d 517, 522 (9th Cir.1987); *DeLetelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir.1984); *De Sanchez v. Banco Central de Nicaragua*, 515 F.Supp. 900, 903 (E.D.La.1981), *aff'd*, 770 F.2d 1385 (5th Cir.1985); *Behring International, Inc. v. Imperial Iranian Air Force*, 475 F.Supp. 396, 405 n. 9 (D.N.J.1979). If any of the exceptions appears in the pleadings or is not refuted by the foreign state asserting the defense, the motion to dismiss the complaint must be denied. *See Gibbons v. Undaras na Gaeltachta*, 549 F.Supp. 1094, 1107 (S.D.N.Y. 1982). Of the listed exceptions, only that for commercial activities applies here.[3]

■ In evaluating a claim of immunity under the FSIA, courts must first define with precision the activity or the act in connection with that activity that gives rise to plaintiff's claims. *Braka v. Bancomer, S.A.*, 589 F.Supp. 1465 (S.D.N.Y.), *aff'd*, 762 F.2d 222 (2d Cir.1985). This step assumes more significance when, as here, the parties dispute which activities actually give rise to plaintiffs' claims.

■ The acquisition of JMB by the Bank of England was, in reality, the temporary nationalization of a financially troubled private bank. The nationalization of a bank is a quintessentially sovereign activity and may not serve as the basis for a suit against the Bank. *Alberti v. Empresa Nicaraguense*, 705 F.2d 250 (7th Cir.1983); *Carey v. National Oil Corp.*, 453 F.Supp. 1097 (S.D.N.Y.1978), *aff'd*, 592 F.2d 673 (2d

Cir.1979). Nor may the activities strictly necessary to consummate that acquisition provide a basis for a suit against the Bank of England.

As plaintiffs contend, however, this action arises not out of the nationalization of JMB *per se*, but rather out of the specific repudiation of JMB's financing agreement with plaintiffs. As the Bank concedes, should the Court determine that JMB's activity in this regard be deemed the activity of the Bank, the claim for immunity must be denied.

■ The FSIA does not affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state. *First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 620, 103 S.Ct. 2591, 2596–97, 77 L.Ed.2d 46 (1983). Rather, "principles ... common to both international law and federal common law, which in these circumstances [are] necessarily informed both by international law principles and by articulated congressional policies," govern the decision. *Id.* at 623, 103 S.Ct. at 2598. By those principles, "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 627, 103 S.Ct. at 2600. The presumption that a foreign government is distinct from its instrumentalities or that two instrumentalities are separate may be overcome (1) when the corporate entity was so controlled that a relationship of principal and agent is created or (2) when regarding the entity as distinct from the state or from another state instrumentality would work fraud or injustice. *Id.* at 629–30, 103 S.Ct. at 2601–02; *Hercaire International Inc. v. Argentina*, 821 F.2d 559 (11th Cir.1987) (presumption of independent status may be

---

**3.** The FSIA states, in pertinent part:
    (a) A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—
       \*    \*    \*    \*    \*    \*
    (2) in which the action is based upon a commercial activity carried on in the United

States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States; ...

28 U.S.C. § 1605(a).

overcome only by showing an abuse of the corporate form); *Letelier v. Republic of Chile, supra,* 748 F.2d at 794–95 (foreign instrumentality answerable if it has abused the corporate form); *see Gibbons v. Republic of Ireland,* 532 F.Supp. 668, 671 (D.D.C. 1982) (sovereign subject to suit for actions of instrumentality only where representatives of the sovereign "participated at least to some degree in the events giving rise to the action"); *cf. United Euram Corp. v. Union of Soviet Socialist Republics,* 461 F.Supp. 609 (S.D.N.Y.1978) (instrumentality was a subdivision, or acting on behalf of another instrumentality).

■ Plaintiffs assert that the Bank of England directed and controlled the alleged repudiation of their financing agreement with JMB. They rely on the following specific actions by the Bank:

1. the Bank of England appointed one of its highest-ranking executive directors, Mr. Rodney Galpin, as Chairman of JMB, to run JMB while continuing his responsibilities with the Bank of England;

2. Mr. Galpin's successor as JMB Chairman in October 1985 was another high-ranking Bank of England executive director, Mr. David Walker;

3. the Bank of England fired all JMB's banking directors, replacing them with Bank of England officials or ex-officials, or other non-JMB retired banking executives;

4. the Bank of England appointed its own lawyers, Freshfields, and its own accountants/auditors, Price Waterhouse, to analyze JMB's situation and guide JMB/Bank of England actions regarding various accounts, including plaintiffs;

5. Beyond Mr. Galpin and the other directors, its accountants and its lawyers, the Banks of England sent over one hundred other people, including over fifty of the Bank's permanent staff and executives, to manage JMB or its accounts after the takeover;

6. critical loan analyses by Price Waterhouse, including examinations of plaintiffs, were delivered only to Mr. Galpin, for forwarding either to the JMB Board or the Bank of England offices, or for any other use Mr. Galpin deemed appropriate;

7. Mr. Galpin had repeated, confidential discussions with officials of plaintiffs' creditors—Johnson Matthey PLC—concerning JMB's dealings with the plaintiffs;

8. the Bank of England considered itself responsible for all JMB commitments, including those to plaintiffs;

9. the Bank of England not only analyzed JMB's loans and loan procedures, but implemented new information and loan-recovery systems pertinent to plaintiffs and monitored all loan-extension and loan-recovery transactions in detail;

10. Bank of England personnel, including Mr. Galpin, either personally conducted, or were kept continually advised of, all dealings pertaining to the plaintiffs; and

11. Mr. Galpin chaired the JMB Board and its Executive and Audit Committees, which were the only bodies to make the decisions injuring plaintiffs and complained of in this action.

Plaintiffs' Supplemental Memorandum in Opposition to The Bank of England's Motion to Dismiss at 4–5 ("Plaintiffs' Supplemental Memorandum").

The Bank of England has contradicted plaintiffs' assertions by submitting Harper's deposition testimony. *See* Supplemental Declaration of Robinson B. Lacy, Ex. C (executed November 14, 1986) (October 31, 1986 deposition of Martin J. Harper). Harper testified that he made the recommendation to JMB's executive committee that JMB not advance additional funds to plaintiffs. *Id.* 181–83, 186. As Harper elaborated, he made the recommendation after consulting two other JMB offi-

cers, George Copus and Steven Grady,[4] but he testified that neither he nor, to his knowledge, any other member of the JMB executive committee had received advice or instructions from the Bank of England on the decision. The JMB executive committee, in accordance with Harper's recommendation, made the final decision not to advance additional funds to plaintiffs. *Id.* 183. Harper explained that the committee had the authority to make the final decision, and was not required to and in fact did not seek the approval of the Bank of England. *Id.* 184, 186.

Harper also testified that throughout his tenure as a director, JMB's duly constituted board of directors ran the bank's business. *Id.* 178. While certain personnel from the Bank of England's Banking Supervision Division were present at JMB immediately following the acquisition on October 1, 1984, he explained that their role in the ongoing affairs of JMB "diminished very rapidly." *Id.* 70. By the end of October, the board had assumed full responsibility for JMB's management, *id.* 67–70, and neither sought nor took instructions concerning specific lending decisions, *id.* 179. In sum, Harper testified that none of the efforts of the Bank of England to rehabilitate JMB involved interference in its day-to-day affairs.

Q  Could you tell us generally how the Bank of England has gone about trying to rehabilitate JMB?

MR. RUEGGER: I will object. Go ahead.

A  By giving every support and encouragement to the board of JMB. I think that's all I can say on that.

MR. LACY: No further questions.

BY MR. RUEGGER:

Q  Concerning your last answer, Mr. Harper, specifically how the Bank of England had [sic] given its support and encouragement to the Johnson Matthey board.

A  Well, they have kept out of our hair. They haven't interfered in any way. They have not queried or questioned our decisions. They have just been extremely supportive.

When we required money, additional capital, they have provided it. The indemnity agreement only filled in the hole created by the losses. It didn't restore the capital.

The board of Johnson Matthey Bankers pointed out to its stockholders that in order to operate the business we needed capital. The Bank of England supplied it.

Q  So they supplied capital and otherwise done nothing?

A  They have done nothing but they have done nothing in the sense of not interfering and getting in our hair. Whenever we required support from the service arms of the Bank of England, that has been readily forthcoming.

*Id.* at 200–02.

Despite the discovery already conducted on this issue and the opportunity to depose Galpin, plaintiffs have not presented the Court with any solid evidence that the Bank of England directed or participated in the specific decision not to lend to plaintiffs nor have they offered anything beyond conjecture to challenge Harper's account that in fact the independent management of JMB made the decision.

Similarly, beyond wishful characterization, plaintiffs have not substantiated their allegations that the Bank of England so closely supervised JMB that the Court would be warranted in imputing the decision not to lend to plaintiffs to the Bank of England even if Bank personnel, in their capacity as Bank personnel, did not directly participate in the decision. Of the eleven

---

**4.** Copus had been corporate finance director and later a senior director and chairman of the credit committee of Standard Chartered Merchant Bank before the Bank of England asked him to become the executive commercial banking director of JMB in October of 1984. Grady had been seconded from Barclays Bank where he had worked in its department responsible for borrowers in financial difficulty. He joined JMB as its senior banking executive in charge of a team of personnel seconded by Barclays who reviewed loans and prepared reports on which JMB based its decision whether to continue banking relationships with specific clients.

instances plaintiffs suggest indicate this close supervision, points 1, 2, 3, 4, 5, 6, 8, and 9 would all seem, at this point, to concern emergency steps the Bank took to rehabilitate JMB immediately following its acquisition. Given the gravity of a potential collapse of JMB, that the Bank of England would decide to replace JMB's directors, to hire counsel and auditors, and to guarantee JMB's obligations does not seem particularly surprising, nor would it appear to provide plaintiffs a cause of action. While the allegations concerning Galpin's dual responsibilities at JMB and at the Bank of England contained in points 7, 10, and 11 might conceivably support an argument that the Bank of England may have participated directly in the decision on their loans, plaintiffs have neither substantiated those contentions with documentary evidence nor availed themselves of the opportunity to depose Galpin.

In sum, the Bank of England has demonstrated that the FSIA exception for commercial activity does not apply to its activities concerning JMB. Plaintiffs have failed to rebut the Bank's evidence that it neither made the specific loan decision at issue nor exercised general control over the day-to-day activities of JMB such that JMB might be considered its agent.

Plaintiffs have made no persuasive argument that the Court should permit further discovery on this issue. Holding that the Bank of England is immune to plaintiffs' suit and dismissing the complaint without prejudice works no fraud or injustice in this instance. JMB's successor, Minories Finance Limited, remains liable for the alleged breach of the finance agreement plaintiffs had with JMB and could readily satisfy any judgment should plaintiff prevail on the merits at trial. If, as plaintiffs contend, the Bank specifically influenced the decision by JMB not to loan them funds, that fact could be elicited from personnel who worked at JMB or records of those instructions could be obtained from Minories Finance Limited. Inasmuch as defendants' counsel has already agreed to respond to reasonable discovery requests directed to JMB's records, or to Bank of England personnel who worked at JMB, concerning the Bank of England's involvement in JMB activities as it might relate to plaintiffs' asserted causes of action, the Bank's immunity in no way prejudices plaintiffs' rights or obstructs the conduct of this litigation.

## CONCLUSION

Through its submissions to this Court, the Bank of England has demonstrated that the commercial activity exception to the Foreign Sovereign Immunities Act does not apply to its activities in rehabilitating Johnson Matthey Bankers Limited. Inasmuch as the Bank of England is immune from suit concerning those activities, the Court lacks subject matter jurisdiction to hear plaintiffs' claim that the Bank directed JMB to breach a financing agreement. Accordingly, the Court grants the Bank of England's motion and hereby dismisses the complaint as against the Bank. The dismissal is without prejudice to a subsequent motion to vacate the dismissal or to amend the complaint to include the Bank of England should discovery reveal that one of the statutory exceptions to sovereign immunity does apply. Defendants' renewed application for attorneys' fees and sanctions is without merit and is denied. The parties are directed to confer and to submit to the Court by July 31, 1987 proposed dates by which they expect to complete discovery and to file a joint pretrial order.

It is so ordered.