Leonard v. Stout.

---

AMASA LEONARD v. JEROME L. STOUT.

1. The first process in personal actions in any of the courts of law of this state, is a summons or *capias*. The writ of attachment is an exceptional and extraordinary remedy given by the statute.
2. The practical test, in case of foreign attachment, is whether a legal service of a summons can be made on the debtor, at his dwelling-house or usual place of abode, in this state. If it can, the extraordinary writ of attachment cannot be used.
3. To constitute a residence in the state, within the attachment act, it must be the debtor's home where he then is, or to which, if he be absent, he has the intention of returning, and where, in his absence, he is represented by some member of his family, or some one who can answer for him and communicate with him.
4. In this case the debtor had two places of abode—one in New York and one in New Jersey. The decisive points here are, that he votes in this state, and refused to vote in New York; has often expressed his intention to reside here; that when the attachment issued, persons regarded by him as members of his family were living at his home in Morris county; that this house was kept open, and often visited by him and his wife while they were living in New York, through the winter.

---

The *certiorari* in this case to the Morris Circuit Court, reviews an order of that court, made March 10th, 1873, in a suit of foreign attachment, brought by Jerome L. Stout against Amasa Leonard, refusing to quash the writ and supersede the attachment.

The writ was issued February 13th, 1872, and a farm and other property of the defendant, Leonard, were taken in said county.

The facts upon which the motion to quash was based, appear in the opinion of the court.

Argued at June Term, 1873, before Justices WOODHULL and SCUDDER.

For the plaintiff in *certiorari*, *A. Mills* and *C. Parker*.

For the defendant, *H. C. Pitney*.

The opinion of the court was delivered by

SCUDDER, J. Our practice act, section seventeen, defines what shall be the first process in personal actions in any of the courts of law of this state. A summons, or a *capias ad respondendum*, begins the action in our common law courts. The writ of attachment is an exceptional and extraordinary remedy, whereby the property of the defendant is first seized, and afterwards publication of notice made that he may appear and plead to the action. It is provided under our statute in two cases—either where the debtor absconds from his creditors and is not resident in the state at the time, or where the debtor resides out of the state and has property in the same.

In the former case, absence by absconding or concealment has been held to be the meaning of the term not resident.

In the latter, the word " residence " has the signification of a dwelling-house, or usual place of abode.

The practical test in the latter case, with which we are now concerned, is whether a legal service of a summons can be made on the debtor at his dwelling-house, or usual place of abode, in this state. If it can, the extraordinary writ of attachment cannot be used—the defendant must be sued by summons, or *capias*. If it cannot, then the defendant's property may be attached.

By the ordinary rule of construction, this procedure should be contested by the courts with strictness, as it is a departure

Leonard v. Stout.

from the usual common law methods; but by section 60, of the statute, the act must be construed in all courts of judicature, in the most liberal manner, for the detection of fraud, the advancement of justice, and the benefit of creditors. In this spirit of liberality it has always been construed in our courts, and every proper concession has been made in favor of the jurisdiction assumed under the writ. But this does not mean that the express words by the statute will be disregarded or misinterpreted for the vexation of a debtor, who is amenable to the ordinary process of the courts. We must still construe the statute as it reads, and according to its spirit and intent.

In a recent case (*Perrine* v. *Evans*, 6 *Vroom* 221,) it has been decided in this court that mere presence in the state is not residence. Neither will it be held that mere absence is non-residence, within the terms of the statute. As is stated in the case above cited, the description in the statute of "debtors who reside out of the state," means debtors who have not an abode in this state; or we may render it in other words, by referring to our practice act as meaning debtors who have no dwelling-house or usual place of abode in the state where the process of summons can be served. It is not enough to prevent the use of the writ of attachment, that a personal service by *capias* or summons may be made, the debtor must be in such position that a summons cannot be served upon him by leaving it at his residence or usual place of abode.

Such residence need not be strictly the domicil where a person has an exclusive and only actual residence, with an intention to remain. It need not be where a man has his birthright or his citizenship, for he may well have the rights and duties which attach to a domicil in one place and a residence or abode in another. It is no solecism to say that a man has two homes. He may have one in the city and another in the country. He may have one in one state and another in another state. He may reside with his family part of the year in one dwelling-house, and part of the year in another in a different place, and when absent from one home,

have the intention to return to it again as an abode. To constitute such residence within our statute, it must be either an actual present dwelling-house, or an usual or customary place of abode. It must be his home where he then is, or to which, if he be absent, he has the intention of returning, and where, in his absence, he is represented by some member of his family, or some one who can answer for him and communicate with him. If he be absent, and have no such representative, no effective service of a summons can be made. He has deprived his creditor of the ordinary legal remedy, and he may therefore resort to the extraordinary. A summons cannot be served where a dwelling is unoccupied. It cannot be fastened to the door. *Miller* v. *Doolittle*, 2 *South.* 845. What has been said is intended to be descriptive of the term residence, as used in this statute, rather than an attempt at exact definition, in a general application, of the term domicil or residence, and their distinction.

As was said by the court in *Abington* v. *North Bridgewater*, 23 *Pick.* 176, it is difficult to form any exact definition. As a question of fact, it sometimes depends on minute shades of distinction, which can hardly be defined. It must often depend upon the circumstances of each case, the combinations of which are infinite. Yet it will generally be found in practice, that there is some one or a few decisive circumstances which will determine the question.

Let us now look as briefly as possible at the facts of this case, to determine whether, on February 13th, 1872, when this writ of attachment was issued, the defendant, Amasa Leonard, resided out of this state, or whether he had a dwelling-house, or usual place of abode in this state, where service of a summons could have been made upon him.

He was actually living, at that time, in the city of New York, in his own house, with his wife, son, and daughter. His business was also carried on by him in that city. In October, 1864, he bought a farm in Mendham township, Morris county. He repaired the buildings, furnished the house, took his family there in November, and remained with them there

the following winter. During that winter, and up to 1867, Leonard appears to have had a dwelling in New York and the house upon his farm, which were occupied at different times by his family. In 1867 he broke up housekeeping in New York, for a time. In April, 1869, he broke up housekeeping altogether in New York, living only in Mendham, until December or January following, when he rented a house again in New York, until May, when he returned again with his family to Mendham. He remained there until December, 1870, and since that time has occupied his own house in New York. This house was rented from May, 1869, to December, 1870, to Mr. Stephens. From December, 1870, to October, 1871, Mr. Stephens and his wife boarded with Leonard. In December, 1870, some furniture was taken from the house in Mendham to the house in New York, where the family remained through the winter, and in the summer of 1871 the family were again on the farm at Mendham.

From May, 1869, when the house in New York was rented to Mr. Stephens, up to the time of issuing the writ of attachment, and since, the house at Mendham has always been kept open, and some one or more, whom the defendant calls part of his family, have been there. On February 13th, 1872, when the writ was issued, Leonard's wife's mother, Mrs. White, a boy named Burnside, who was a connection of his wife, and whom, he says, he had adopted, were in the farmhouse, and continued there after the other members of the defendant's family had gone to New York, in the fall previous. Besides these, David M. Kaggen and wife, and their five children, were in the house. They had been there during the summer previous, while Leonard's family were there. Kaggen worked the farm, and had general charge of the place in Leonard's absence, and his wife worked in the house. When the family were all there, a servant or two came from the house in New York to assist. A boy named Walter Merrifield, who was employed by Leonard to work on the farm, was also there.

Leonard paid Kaggen and his wife wages, furnished provisions for Mrs. White, Walter and young Burnside during the winter of 1871–2, and all the fuel that was used in the house. The house was kept open, and Leonard and his wife came up occasionally through the winter and passed the night there. The furniture, except that which was used by Kaggen's family in their own rooms, belonged to Mr. Leonard.

In the fall of 1870, Leonard voted at the election in Mendham township, for the plaintiff in attachment, Mr. Stout, who was then running for the office of sheriff, at his request. At the state election in New York, in November, 1871, Leonard was asked to vote, and refused to take the ticket that was offered him, saying, openly, that he was a resident of New Jersey. He swears, that since 1868 it has been his intention to make his residence in New Jersey. He has not been registered as a voter in New York since 1868. He had a box in the post office at Morristown, where he received newspapers and letters. He had a pew in the Methodist Episcopal Church at Morristown. He had a lot in the cemetery at Morristown, and had bought a lot on one of the principal streets of that place, for the purpose of building himself a house there. A summons had also been served by the sheriff of Morris county, by leaving a copy at his house on the farm, in his absence.

Opposed to these facts which go to show Leonard's residence in Morris county, it is urged upon the evidence, that his house in New York, which was valuable and well furnished, when contrasted with the small house in the country, which was plainly furnished, and overcrowded when the family were there, shows that the former was his true home, and the latter but a place for temporary and occasional occupation. It is also denied that his wife's mother and young Burnside were members of his family.

It is also proved, that in deeds and agreements executed by Leonard for several months prior and up to the time of the attachment, he was described as of the city of New York. This he, however, explains by saying, that as a business man

he always hailed from New York. And there are other deeds and papers which describe him as of the State of New Jersey. He has always been taxed as a resident of New York, and as a non-resident, without poll tax, in New Jersey. But this does not appear to have been done in either case by his direction.

An attempt was made to serve a summons upon him, issued out of the justice's court in the winter of 1871–2, for trespass done by his cattle, and failing to find him at the farm, the constable returned the writ without service. He also told the attorney about that time that it could not be served upon him there.

Several witnesses testified that he had told them in 1870 and in 1871 that he resided in New York and was not a voter in New Jersey.

Stout and others say that after he voted in 1870, he was asked, at Stout's house, "If he did not think he had done wrong," to which he replied that "he did not think he had done wrong; he voted to correct a wrong." Stout says this wrong refers to an illegal vote which had been put in just before his against Stout, which his vote for Stout balanced. Leonard says what he said meant that his vote was cast to right the wrong done Stout by certain calumnies that had been spoken of him during the canvass when he was a candidate for sheriff.

It was also shown that he had never voted in Morris county except in the fall of 1870, and had not been canvassed by his party in their poll list as a voter.

The testimony is voluminous, and there are other minor facts and circumstances shown to prove and disprove his residence in Mendham township.

While there is conflict in this testimony, it appears to me that the decisive points are that he voted in Mendham township in the fall of 1870, without challenge; that he had expressed his intention before that time to make his residence at his mountain home in New Jersey; that after that time he refused to vote in New York, saying he had changed his

voting place; and that after April, 1869, some person or persons, regarded by him as part of his family, lived in this house on the farm, and that this house was kept open and often visited by him and his wife while they were living in New York, through the winter, and that he now expressly makes oath that it has been his intention, since 1868, to have his home in Morris county. Without proof of some decisive act to show a change of such intention, I think these facts are conclusive.

These bring the case within the principle found in *Story on Conflict of Laws*, § 47, which is thus stated : " If a married man has two places of residence, at different times of the year, that will be esteemed his domicil which he himself selects, or describes, or deems to be his home, or which appears to be the centre of his affairs, or where he votes, or exercises the rights and duties of a citizen."

And this residence, once obtained, continues until a new one is gained. It is not changed by his occasional absence, with or without his family, if it be *animo-revertandi*.

The cases in this court are clear upon these points; see *Cadwalader* v. *Howell*, 3 *Harr*. 138 ; *State* v. *Ross*, 3 *Zab*. 517 ; *Bonnell* v. *Dunn*, 4 *Dutcher* 153 ; and other cases therein cited. Also *Thompson's Case*, 1 *Wend*. 45; *Fitzgerald's Case*, 2 *Caines R*. 318.

The order of the Circuit Court, refusing to quash the writ of attachment, is reversed, and the writ must be set aside.

Judgment reversed. 8 *Vr*. 492.