John M. McQUEENY, Plaintiff,

v.

J. W. FERGUSSON & SONS,
INC., Defendant.

Civ. No. 81–2958.

United States District Court,
D. New Jersey.

Nov. 23, 1981.

Supplemental Opinion Nov. 30, 1981.

Murphy, Ellis & McBride by Martin J. Kole, Hackensack, N. J., for plaintiff.

Shanley & Fisher by Frank L. Bate, Newark, N. J., for defendant.

## OPINION

BIUNNO, District Judge.

This is a suit brought under diversity jurisdiction, 28 U.S.C. § 1332. McQueeny is a citizen of New York. The defendant (Fergusson) is a Virginia corporation with its principal place of business there as well.

When the complaint was filed on September 18, 1981, there was filed with it a Notice of Motion returnable October 13, 1981 for an order directing issuance of a writ of attachment. This was accompanied by an affidavit and supplemental affidavit of McQueeny, outlining the factual basis of his claim, and an affidavit of an attorney reporting the result of inquiry of the N. J. Secretary of State, and through a searching service, of inquiry of Fergusson's corporate status. The New Jersey certificate shows that Fergusson is not a New Jersey corporation, nor a foreign corporation authorized to do business in New Jersey. The report of the search service says that Virginia records disclosed Fergusson to be a Virginia corporation in good standing, its annual reports current, and having a registered office and named agent at a specified address in Virginia.

Although the motion carries no proof of service, Fergusson filed papers in opposition and appeared by its attorney. The affidavit of its president indicates the papers were received in Richmond on September 29, 1981, and a New Jersey law firm engaged on October 5, 1981.

The complaint (and the affidavits for attachment) say, in substance, that McQueeny was hired by Fergusson in 1975 as a sales representative for printed labels for consumer products, including those sold in bottles. He says he was hired on a salary basis plus fringes (use of a company car, major medical, life insurance); and that his employment would continue "indefinitely" unless he failed to produce sales.

He claims that by his initiative, hard work, effort and expertise, he developed a better grade of paper for labels to be used on plastic PET bottles as they came to replace glass bottles, see *Continental Group v. Amoco*, 614 F.2d 351 (CA 3, 1980), and promoted them for sale to major customers, some of whom have plants in New Jersey.

In December, 1978, he says Fergusson was so impressed and enthusiastic over his extensive work on labels for the new PET bottles, that his employment terms were modified as follows:

... his base salary of $32,000 would be raised 10% for 1979, to $35,200, he would receive a Christmas bonus check (amount unspecified), and a participation (unspecified) in Fergusson's profit-sharing plan.

... he would also receive a bonus of 10% of his label sales for 1979 and thereafter, provided those sales aggregated $2 million or more.

He says his label sales in 1979 and 1980 exceeded $2 million in each of those years, and would have exceeded that sum in 1981 had he not been wrongfully terminated September 4, 1981. He says he was terminated for the wrongful purpose of wilfully depriving him of his sales bonuses, to maliciously and wrongfully endeavor to obtain for itself all future sales to customers McQueeny had developed as loyal and satisfied customers without having to pay the 10% bonus agreed on. Despite demands in

May, 1979, December, 1979, April, 1980 and thereafter, Fergusson refused to submit an accounting of McQueeny's label sales for 1979, 1980 and 1981, including (among others) labels sold to New Jersey plants of certain customers.

He says the December, 1978 modification was made by Fergusson with the then calculated and premeditated purpose of not honoring and abiding by it, making intentionally false representations with the knowledge that McQueeny would rely thereon, which he did to his damage. He says he was paid no 10% bonus on his label sales for 1979, 1980 or 1981.

Another paragraph alleges what amounts to defamation by informing prospective employers not to hire McQueeny.

He seeks damages, compensatory and punitive, and an accounting for all his label sales for the 3 years involved.

The opposing affidavit, made on personal knowledge, says that McQueeny was employed as a sales representative from 1975 to about September 4, 1981 on a straight salary basis, and fringes: participation in the profit sharing plan, group medical and life coverage, and use of a company car. Yearly salary and bonuses while employed were (rounded off):

| | | | |
|---|---|---|---|
| 1975: | $20,500 | 1978: | $31,600 |
| 1976: | 25,600 | 1979: | 35,100 |
| 1977: | 28,900 | 1980: | 37,500 |

1981: 27,500 (to termination)

The alleged percentage commission arrangement or any other commission arrangement on any contingency is expressly denied. Figures for McQueeny's sales for each of the years 1975 through 1981 are given, and none reaches $2 million, even after adjusting the 1981 figure to a 12 month basis.

The affidavit also denies any kind of term of employment, whether a fixed term or a term based on contingency; or any fixed salary other than the starting salary in 1975; or any annual percentage increase in base salary; or any amount of Christmas bonus fixed or computed by formula. In each year, Fergusson set the salary, and paid a Christmas bonus (except for 1981) according to its general custom for its employees.

The company president is unaware of anything done by McQueeny to develop a better grade of paper for PET bottles. It obtains paper for that purpose from a national manufacturer which states that it developed the paper.

He also says he had known for some time, from conversations with McQueeny, that the latter was dissatisfied with his salary arrangements, and the company was unwilling to agree to a commission arrangement. For a period before August 4, 1981, with company approval, McQueeny had been using the company car, company facilities and company time to seek employment elsewhere, and then asked for a meeting. The meeting was held August 4, 1981 in New York. McQueeny presented various commission arrangements, but the president was not willing to change the compensation basis, and the two mutually agreed that McQueeny could continue to use company facilities and time to seek other employment until September 4, 1981, at which time he would be terminated.

The defamation claim is flatly denied.

■ The status of the remedy of attachment in New Jersey is in considerable doubt. Since *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), pre-judgment attachment is unavailable for due process considerations unless there are minimum contacts adequate to satisfy the standard of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and later cases in the line. In this circuit, *Finberg v. Sullivan*, 634 F.2d 50 (CA 3, 1980) (en banc) raises serious questions about the validity of post-judgment execution and garnishment.

New Jersey's highest court has ruled, in *Tanner Associates, Inc. v. Ciraldo*, 33 N.J. 51, 161 A.2d 725 (1960) that the source of the attachment remedy is entirely statutory. That statute, N.J.S. 2A:26–2, still allows attachment to issue when, for example, the "defendant is a non-resident of this

state, and a summons cannot be served on him in this state", par. (b). Under *Shaffer*, this formulation read literally is inadequate. Since the source of the right is inadequate, it is doubtful that the statute can be cured by a court rule, since such rules are limited to practice and procedure.

The Supreme Court of New Jersey has modified its practice rules dealing with prejudgment seizures to deal with the problems raised by *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), but no changes have been made since *Shaffer*.

The main difficulty, as observed long ago, is that attachment as original process in rem or quasi in rem is an extraordinary writ. It would be wholly inconsistent with the spirit, design and intent of the authorizing statute to allow it to be used when the defendant can be reached effectively by summons, the ordinary process, which secures in personam jurisdiction over him. See *Baldwin v. Flagg*, 43 N.J.L. 495 (Sup. 1881); *Leonard v. Stout*, 36 N.J.L. 370 (Sup. 1873); *Kugler v. Shreve*, 28 N.J.L. 129 (Sup. 1859); *Branson v. Shinn*, 13 N.J.L. 250 (Sup. 1828); *City Bank v. Merritt*, 13 N.J.L. 131 (Sup.1832).

Attachment statutes in New Jersey were designed on jurisdictional concepts long recognized and articulated in *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1878). Under those concepts, no in personam jurisdiction could be achieved by a State without accomplishing personal or constructive service within the territorial boundaries of the State, and this notion is the reason why the attachment statutes are phrased as they are. *International Shoe* changed all that and permits effective in personam jurisdiction based on service outside the territorial boundaries under the "long-arm" concept.

■ No New Jersey court has addressed this point, and until one does, it is this court's view that its Supreme Court would rule that it was the legislative intent not to allow the extraordinary writ of attachment except in cases where in personam jurisdiction cannot be achieved, whether within the State or outside the State, within the limits of due process.

■ Both *International Shoe* and *Shaffer*, of course, require minimum contacts in accordance with the standard to have any hope of jurisdiction. But in particular cases, even though there be actual presence or adequate contacts, it may not be possible to achieve effective service of process. A defendant may go into hiding, even within the State. It may not be possible to locate an out of state defendant. In such cases, given minimum contacts coupled with inability to achieve service, attachment may be warranted.

■ Given the legislative intent, and given the amenability of Fergusson to the accomplishment of effective long-arm service, whatever reasons might otherwise warrant attachment do not exist.

In the circumstances of this case, there is another reason why the writ should not issue. The federal rules of procedure spell out no details for the writ. They merely provide that State law is to be applied. See Rule 64, Rule 4(e)(2), F.R.Civ.P. New Jersey Court Rule R. 4:60–5(a) requires that there be "a probability that final judgment will be rendered in favor of the plaintiff." No such probability appears on the present record. The complaint and supporting affidavits are oddly silent on the question whether the agreement was oral or written and no documentary items chargeable to Fergusson are tendered to confirm McQueeny's bare assertions. Nothing is said to explain the long delay if the modification was effective for 1979. Also, at the hearing, it was said that the repeated reference in the complaint and in the affidavits to a 10% commission was an error. It should have read 1%, instead. The court was also told that the commission was to apply to the entire $2 million or more of sales, not just to the excess over $2 million. A commission of 10% on the excess sounds rational, but 10% on the first $2 million sounds implausible. Of course, 1% is a different matter, but if there really were an agreement in December, 1978 for 1%, and McQueeny were so interested in it through 1979, 1980 and eight months of 1981, how could he have made the gross error he did?

■ The allegations of fraud are conclusory, and provide nothing by which to evaluate their merit, see Rule 9(b), ·F.R.Civ.P.

The responding affidavit effectively contradicts every significant assertion of fact, and it does so with supporting detail, not by negative pregnant.

Taking the complaint and moving affidavits in their best light, the responding proof at least puts the key elements in equipoise. This is especially so in respect to the matter of developing an improved paper for PET bottles. In this posture, the court certainly cannot say that it is "probable" that McQueeny can succeed, and for that independent reason, the writ cannot issue.

It should be made clear that this court has not held the New Jersey attachment statute to be unconstitutional. It has serious doubts in view of *Shaffer*, and even if it were construed to allow attachment when the standards of that case are met, it is doubted that the Legislature intended use of the extraordinary writ when in personam jurisdiction can be achieved in fact within constitutional limits to their outermost boundaries, because the summons and attachment have always been essentially mutually exclusive.

The application for the writ is denied. Submit order.

Since Fergusson's papers challenged the constitutionality of the N.J. attachment statute, the court issued its certificate as required by 28 U.S.C. § 2403(b), and at the request of the Attorney General, an order has been entered allowing New Jersey to intervene for the purpose of the statute. The court has not received the papers to be submitted by the Attorney General in support of the statute, but in view of the disposition made above, it is unnecessary to reach the constitutional issue, in accordance with well established jurisprudential principles, and no ruling on the point is made or implied.

■ Fergusson also moved to transfer the action to the U.S. District Court for the Eastern District of Virginia. That motion will be denied for the time being, without prejudice to renewal after discovery. The reasons are practical. Wherever the action be tried, the critical discovery will be of the parties, and Fergusson has already incurred the expense of engaging a New Jersey law firm. Discovery of McQueeny, who lives in New York, can be accomplished conveniently, if oral examination on deposition and document discovery be needed, at the offices of Fergusson's attorneys in Newark, and this should be processed first. Of course, the expense of depositions should be avoided or reduced by beginning with requests for admissions, and then interrogatories if needed.

Discovery of Fergusson is to begin promptly after completing McQueeny's discovery. Document discovery and depositions, if needed, of Fergusson personnel should be conducted at its principal offices in Virginia.

The provisions of the order denying the motion for discovery is to set out these terms. Submit accordingly.

### MEMORANDUM

#### Supplemental Opinion

Since the handing down of the court's opinion in the above matter, the court has received the brief submitted by intervenor State of New Jersey, in support of the constitutionality of New Jersey's attachment statute, N.J.S.A. 2A:26–2.

The opinion expresses the view that, in light of the legislative history and purpose of the attachment statute, as well as the substantial modification of the law applicable to *in personam* jurisdiction, the highest court of New Jersey would probably construe the statute to allow attachment as original process only when effective service (whether actual or constructive within the State, or by long-arm service outside the State) could not be achieved.

Under this construction, there would be no denial of equal protection as between residents and non-residents. A resident may frustrate effective service by concealment in or absconding from the State. In the case of a non-resident, it may be that

effective long-arm service cannot be achieved despite the existence of sufficient minimum contacts.

In either situation, then so long as there is property that can be levied on within the State, attachment would be allowable so long as all the other requirements were met, including the minimum contacts requirement.

While the rationale is different, the result is the same as advanced by the State, namely that the statute is valid.